**UNITED STATES of America, Appellee,**

v.

**Fred AWON, Defendant, Appellant.**

**No. 96–1916.**

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1997.

Decided Feb. 2, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 25, 1998.

Robert A. George, Boston, MA, for appellant.

James F. Lang, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.

Before STAHL, Circuit Judge, COFFIN and ALDRICH, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Defendant Fred Awon appeals his conviction for arson, use of a fire to commit a felony, and mail fraud. He asserts that the district court erred in: (1) admitting prior consistent statements of two government witnesses; (2) limiting cross-examination of a witness; (3) refusing to grant a mistrial after improper cross-examination of defendant; and (4) imposing too high a base offense level at sentencing. Most of this opinion deals with the first issue. We fault the government for pressing admission and the court for admitting the evidence, but conclude that the error could not have affected the verdict. We affirm.

## I. BACKGROUND

Defendant was convicted by a jury for twice orchestrating the arson of a building located on Ames Street in Brockton, Massachusetts ("the Ames building") by hiring James St. Louis, and two brothers, Jorge and Joaquim Neves, to set the fires.[1] The Ames building, owned by defendant and his father, contained vacant retail space on the first floor and two occupied residential apartments on the second floor at the time of both

---

1. St. Louis and defendant were tried together, but St. Louis, indicted for setting both fires, was convicted for setting the second fire only. Jorge Neves, who was involved in the first fire, was never charged, but Joaquim was indicted on four separate counts and, before trial, entered into a plea agreement with the government whereby he pled guilty to arson and mail fraud counts stemming from his role in the second fire.

fires. The first fire caused minimal damage; the second required the demolition of the building and two adjacent buildings.

We review the evidence presented at trial by defendant and the government. Because defendant does not challenge the sufficiency of the evidence, we describe the relevant evidence without favor to either party to provide context for the claimed errors. *See United States v. Morla-Trinidad,* 100 F.3d 1, 2 (1st Cir.1996).

## A. The Neves Brothers

Jorge testified that, in mid–1994, St. Louis recruited him to help set fire to the building, stating that they would receive money and a car as payment from defendant, who owned a used car dealership. Jorge admitted to pouring and lighting gasoline on the first floor of the building, at the direction of St. Louis. Firefighters arrived shortly thereafter, preventing damage to the building; as a result, Jorge never received payment from defendant.

Jorge's testimony also revealed that the government agreed not to prosecute him in exchange for his cooperation in court, that for the past six months he had been held in custody as a material witness and wanted to be released, and that he had several criminal cases pending against him at the time of trial.

Joaquim testified that, in the summer of 1994, he learned from St. Louis' brother that defendant was looking for someone who would burn down the Ames building. Joaquim reported that he agreed to set the fire in exchange for $5,000, and then solicited St. Louis' assistance; but, an illegal immigrant, he was detained by the United States Immigration and Naturalization Service (INS) before he could act. After his release on bail, he and St. Louis told defendant they would set the fire. Joaquim testified that he witnessed defendant agree to pay St. Louis with a car valued at $2,900. Joaquim admitted pouring gas on the first and second floors of the Ames building, which was then lit by St. Louis, resulting in an explosion and fire that destroyed the building.

Joaquim also testified that, the day after the fire, he and St. Louis went to defendant's shop, where St. Louis signed paperwork for the car. The following day, Joaquim went with St. Louis to get the car from defendant, and a few days later, he personally received $2,100 in cash from defendant.

Joaquim reported that, in exchange for his testimony and a guilty plea, the government would request that the court depart downward from his guidelines sentence. He also acknowledged that he feared impending deportation, and that he had an extensive criminal history.

Defendant denied soliciting either of the Neves brothers to commit arson. He explained that Joaquim had become angry with him sometime prior to the fire because defendant had refused to provide him with bail from INS custody, and had twice ordered Joaquim off his car lot. On the first occasion, about two weeks before the second fire, Joaquim told defendant that he wanted to buy an expensive car, and became angry when defendant questioned him about where he would get the money; the second time, when defendant asked Joaquim whether he had been involved in the fire, Joaquim responded in the negative, but smirked suspiciously. On cross-examination, defendant stated that he did not tell the police when they interviewed him before trial about any existing hostility between himself and Joaquim.

St. Louis' brother denied having any conversation with defendant or Joaquim about burning defendant's property.

## B. The Car Transfer

In addition to Joaquim's testimony that defendant paid St. Louis with a car, the government introduced into evidence business records belonging to the defendant's auto company. These indicate that defendant sold a car to St. Louis for $2,000 one day after the second fire. They also indicate that, a few months earlier, the company had purchased that same car for $2,220.

Defendant testified that the sale to St. Louis was a legitimate one, for which he received $2,000 in cash. He explained that

he sold at a loss because the car had mechanical problems and had failed to sell for a few months at the intended price of $3,500. Defendant said that he questioned St. Louis about the source of the $2,000, and that St. Louis refused to answer him.[2]

Joaquim's mother testified that, when her son was in INS custody, she gave St. Louis $1,000 toward the $3,000 needed for his bail and, the following day, Joaquim was released. The defense argued that this evidence showed, inferentially, that St. Louis had supplied the remaining $2,000, which, as soon as Joaquim repaid it, St. Louis used to buy the car from defendant. On cross-examination by the government, Joaquim's mother stated that she did not know whether St. Louis put up any money for Joaquim's release on bail from INS custody.

## C. *Motive*

The government introduced evidence showing that the Awons were losing money on the Ames buildings and, at the time of both fires, the property was insured for loss to the structure of up to $80,000, and losses attributable to business interruption of up to $12,000. After the first fire, defendant and his father negotiated an insurance settlement in the amount of $4,171. After the second fire, they negotiated a settlement totalling $91,176, and then used this money to pay their mortgage on the property.

Defendant's parents testified that all of the money invested in the Ames building belonged to them, that their son had no responsibility for financial expenditures related to the building, and that he had never received rental income from the apartments. They explained that their son's name was included on the deed and mortgage only because they did not speak English fluently and needed their son's assistance to translate the documents. They described their son's involvement with the property as limited to showing the apartments to prospective tenants and responding on occasion to maintenance requests. They also stated that they, not their son, received the settlement money after the fires.

Defendant testified that, while a co-owner of the Ames building, he did not put up any of the purchase money, make any mortgage payments, or pay taxes on the property. On cross-examination, however, the government introduced evidence that defendant had made at least one mortgage payment on the property. Defendant then stated that he could not remember having made any other mortgage payments. He also admitted that his name was listed on the settlement check from the insurance company, but maintained that his father received all the proceeds.

## II. ADMISSION OF THE NEVES' OUT-OF-COURT STATEMENTS

 The first and only difficult issue we consider in this case is the admission at trial of out-of-court statements made by the Neves brothers. Each brother made a written and oral statement to police months before trial, implicating himself, St. Louis and defendant in the respective arsons. These statements, which were otherwise inadmissible as hearsay, were admitted at trial under an exception for prior consistent statements. We generally review admission of hearsay evidence for abuse of discretion. *United States v. Paulino*, 13 F.3d 20, 25 (1st Cir. 1994). But where, as here, the issue concerns a factual determination, such as when the statement was made relative to a suggested motive to fabricate, we review for clear error. *See United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir.1988). We may affirm the district court's admission of hearsay testimony on any ground apparent from the appellate record. *United States v. Alzanki*, 54 F.3d 994, 1008 (1st Cir.1995).

### A. *Rule 801(d)(1)(B)*

 The district court allowed use of the Neves' out-of-court statements under Fed. R.Evid. 801(d)(1)(B). Under that rule, prior consistent statements that would otherwise be inadmissible hearsay evidence may be admitted into evidence when: (1) the declarant testifies at trial and is subject to cross-examination; (2) the challenged statements and trial testimony are consistent; and (3) the

---

**2.** St. Louis did not testify at trial.

challenged statements are offered to rebut a charge that the declarant recently fabricated his story, or that the declarant became subject to some improper influence or motive to falsify after making the statements. *See Tome v. United States*, 513 U.S. 150, 158, 115 S.Ct. 696, 701, 130 L.Ed.2d 574 (1995) (holding that consistent out-of-court statements may be admitted to rebut a charge of recent fabrication or improper influence or motive only when those statements pre-date the charged fabrication, influence, or motive[3]).

The issue of the Neves' pre-trial cooperation was raised initially on cross-examination. In response to defense questions, Jorge testified that he first made statements implicating himself, defendant, and St. Louis in the fire only after the police said they knew he was involved and promised not to charge him if he cooperated. Similarly, Joaquim explained on cross-examination that he made out-of-court statements to investigators only after they said they knew he had set the fire, had a lengthy criminal record, and was being sought for deportation, and then promised that they would bring any cooperation to the prosecutor's attention.

On redirect of each brother, the court allowed the government to introduce their out-of-court oral and written statements under Rule 801(d)(1)(B). The oral statements were introduced through the testimony of a government agent; the written statements were admitted as evidence. The government argued, and the court agreed, that these statements were admissible to rebut the motive to fabricate presented by the defense, namely, incentive by the brothers to reduce their punishment for arson. The defense objected, arguing that the alleged motive to fabricate pre-dated these statements, rendering Rule 801(d)(1)(B) unavailable. Defendant renews this objection on appeal.

Our review persuades us that the defendant is correct. The motive to fabricate alleged by the defense—desire for leniency—was the same when the Neves brothers first spoke with police as at the time of their testimony at trial. The government attempts to justify use of the out-of-court statements by pointing out that the defense ascribed additional motives and influences to the Neves that did not exist when the out-of-court statements were made. These were, as to Jorge, that (1) he testified to obtain release from a six-week long incarceration as a material witness; (2) he hoped to receive in exchange for his testimony some dispensation in a different—and new—matter pending against him; (3) his testimony was influenced by pre-trial preparation with the agent who interviewed him. As to Joaquim, these were (1) anticipation of a lesser sentence under a plea agreement that promised a government request for a downward departure of his sentence following his testimony at trial, and (2) trial preparatory sessions with the government. While it is true that these allegations post-dated the out-of-court oral and written statements, the overarching motive alleged by the defense always was hope of leniency, and therefore, the "new" motives amount to no more than smaller subsets of the larger theme. For instance, the assertion that the prosecution directed the Neves' testimony assumes that the brothers had a reason to do as the government requested, namely, hope of a reduced sentence or charge. Likewise, Jorge's desire to obtain release from custody as a material witness was just a specific incarnation of his more general desire not to be jailed for his role in the first fire. *See United States v. Albers*, 93 F.3d 1469, 1482–84 (10th Cir.1996) (even where the circumstances underlying a motive to fabricate have changed somewhat—a formal plea agreement was entered after the statement was made, but before testimony at trial—prior consistent statements remain inadmissible if the motive remains essentially the same).

---

**3.** In *Tome*, the prosecution introduced a child's out-of-court statements concerning sexual abuse by her father, who had primary custody, made while the child was on vacation with her mother. The defense argued at trial that the child's testimony was motivated by her desire to live with her mother. The trial court admitted the state-ments, but the Supreme Court reversed, reasoning that their admission was improper because the child possessed the same motive—to live with her mother—at the time she made the out-of-court statements as when she testified in court. 513 U.S. at 150–55, 166, 115 S.Ct. at 697–700, 705.

Because all the defense allegations of motive to fabricate grew from the same foundation—a pursuit of leniency—the brothers' out-of-court statements were erroneously admitted under Rule 801(d)(1)(B).

### B. *The Doctrine of Completeness*

■ The inadmissibility of these statements under Rule 801(d)(1)(B) does not end our discussion, as we must explore whether the statements could be properly admitted on some other ground apparent from the appellate record. *Alzanki,* 54 F.3d at 1008. The government argues that Joaquim's prior statements[4] are admissible under the doctrine of completeness. This doctrine, codified in Fed.R.Evid. 106, holds that an otherwise inadmissible recorded statement may be introduced into evidence where one side has made a partial disclosure of the information, and full disclosure would avoid unfairness to the other party. *See Irons v. FBI,* 880 F.2d 1446, 1453 (1st Cir.1989); *United States v. Range,* 94 F.3d 614, 620 (11th Cir.1996).

■ While defense counsel cross-examined Joaquim concerning the substance of his written interview statement, and did highlight some inconsistencies between that statement and Joaquim's trial testimony,[5] there is no evidence that—and the government has made no allegation that—the introduction of these pieces of information created any unfairness or potential for misimpression. To the contrary, the government's primary argument is that the written statements bolster the Neves' in-court testimony. The doctrine of completeness does not permit the admission of otherwise inadmissible evidence simply because one party has referred to a portion of such evidence, or because a few inconsistencies between out-of-court and in-court statements are revealed through cross-examination; rather, it operates to ensure fairness where a misunderstanding or distortion created by the other party can only be averted by the introduction

of the full text of the out-of-court statement. *See United States v. Ellis,* 121 F.3d 908, 921 (4th Cir.1997). Here, the inconsistencies revealed were minute insofar as defendant's basic involvement is concerned, and the Neves clearly identified defendant at trial as the mastermind of the Ames building arsons. The doctrine of completeness therefore does not provide a basis for introduction of the earlier statements.

### C. *Harmless Error*

■ The government argues that, even if the introduction of the statements constitutes error, the error was harmless. The erroneous admission of hearsay requires reversal unless the error is shown to be harmless beyond a reasonable doubt. *See United States v. Lombard,* 72 F.3d 170, 187 (1st Cir.1995).

■ By definition, prior consistent statements do not consist of new substantive information. Their impact comes from corroborating other, perhaps less compelling, evidence. The form in which the material is presented to the jury also may affect its weight if legitimacy, possibly otherwise weak, is thereby attached to the statements. *See United States v. Siegel,* 717 F.2d 9, 19 (2d Cir.1983). The question we must answer is whether corroboration resulting from the introduction of the prior consistent statements influenced the jury to the defendant's detriment. *See United States v. Quinto,* 582 F.2d 224, 236 (2d Cir.1978) (finding such influence where the erroneously admitted out-of-court written statement was an official Internal Revenue Service document, and a lengthy, detailed "condensation of the government's whole case against defendant").

As with the typical admission of prior consistent statements, the introduction of the out-of-court statements did not themselves supply any new information to the jury.

---

4. The government makes no such claim as to Jorge's statements, but our analysis considers the doctrine as to both defendants, as we may affirm on any legal ground.

5. Among other minor inconsistencies, the defense brought out Joaquim's earlier claims that

he was solicited to set the fire by defendant directly rather than by St. Louis' brother, that he received $2,500 rather than $2,100 in payment, and that, though both were together, he and not St. Louis lit the gasoline.

Rather, the testimony adduced at trial was complete and convincing in tying defendant to the crime. Not only did the Neves implicate themselves, St. Louis and defendant at trial, but on cross-examination, they revealed having reported defendant's solicitation of them to authorities months before trial.

Nonetheless, both the oral and written statements unquestionably had some effect. The government agent's testimony about the oral confessions lent a measure of credibility to the Neves' stories, if only because a government agent was shown to have believed them. Similarly, the written statements, because they were reduced to print and reviewable during deliberations, added weight to the in-court testimony. *See id.* (describing the introduction of written consistent statements as "[t]he government witnesses in effect accompan[ying] the jury into the jury room.") But, unlike the statements in *Quinto,* the written confessions were not detailed, official documents from an agency denoting authority. Rather, they were fairly compact—one just over one page, the other, just over two pages—handwritten statements made by the witnesses themselves, replete with grammatical and spelling errors. While revealing slight inconsistencies, the out-of-court statements essentially amounted to an abbreviation of the Neves' in-court testimony implicating defendant.[6] This in-court testimony, supported by the circumstantial evidence of motive and car transfer, was unwavering and unambiguous.

The exculpatory evidence presented by defendant was minimal and largely unsupported. For example, it seems unlikely that defendant would sell a car at a loss, and $1,500 less than asking price, without first attempting to sell it at a price slightly reduced from $3,500. In addition, the timing of the sale, shortly after the second fire, was highly suspect, and defendant had an undeniable economic motive to burn the property, even if the jury believed his claim that his parents received the insurance proceeds. Nor does defendant's explanation of how St.

Louis came into $2,000 seem plausible; first, it assumes that St. Louis had $2,000 to lend Joaquim for bail and second, Joaquim's mother testified that she had no knowledge that St. Louis had contributed toward Joaquim's bail. Similarly, while defendant and his parents claimed that he had no financial interest in the Ames building, the circumstantial evidence presented indicated otherwise; for instance, his name was listed on all Ames building legal documents, including the settlement check, and, despite his initial testimony to the contrary, he made at least one mortgage payment on the property. Finally, defendant's claim that Joaquim would have sufficient animosity toward him to set the fire or testify against him seems unlikely, and is unsupported by evidence other than defendant's own testimony. As the evidence against defendant was plentiful and in no way illuminated by the out-of-court statements, we are persuaded beyond a reasonable doubt that the statements did not influence the jury to defendant's detriment. We emphasize that it is the strength of the evidence properly introduced at trial implicating defendant that renders this serious error harmless.

That the statements constituted unnecessary emphasis makes the government's efforts to introduce them particularly difficult for us to understand. Where the law so clearly bars such statements and the evidence is so weighty against the defendant, the government's arguments for their introduction strike us as a serious and careless abuse of the rules of evidence. This fact notwithstanding, the evidence compels us to find that the error was a legally harmless one.

## III. ALLEGED ERRORS DURING CROSS–EXAMINATION AND SENTENCING

Defendant argues that the district court erred in limiting his cross-examination of Joaquim, that the prosecutor improperly im-

---

**6.** On direct, the prosecution failed to elicit testimony from Jorge implicating defendant, but on cross-examination, the defense several times led Jorge to affirm defendant's involvement, which testimony was confirmed on redirect. Because

Jorge's testimony on direct alone did not clearly implicate defendant and did not reveal the prior statements to authorities, our analysis would be different if we had only this testimony to consider.

plied, without basis, that he had funded his codefendant's defense, and finally, that the court erred in calculating the defendant's base offense level for two arson counts. We examine each allegation in turn.

■ Defendant contends that the trial court violated his Sixth Amendment right to confront adverse witnesses when it refused to allow him to question Joaquim about his history of drug dealing. A trial court's restriction of cross-examination may be reversed only for abuse of discretion. *United States v. Ovalle–Marquez*, 36 F.3d 212, 217 (1st Cir.1994). To show abuse, the defendant must demonstrate that the restriction left the jury without sufficient information to make a discriminating assessment of the witness' bias or motives. *United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.1986).

Defendant maintains that the testimony should have been admitted because it supports the defense theory that Joaquim set fire to the Ames building on his own initiative to dissuade defendant, a past informant for the Drug Enforcement Administration ("DEA"), from reporting his drug dealing, or, alternatively, as revenge because he believed defendant had already reported him. During a sidebar discussion, the court asked for some offer of proof from defendant that Joaquim had reason to believe that defendant would report him. Defendant offered evidence that, before the second fire, Joaquim told defendant that he would soon be getting a great deal of money and that Joaquim became hostile when defendant questioned him about its source. Joaquim, however stated on voir dire that he had been unaware that defendant was a DEA informant, and defendant offered no evidence in rebuttal. Concluding that defendant's offered evidence was too tenuous, the court prohibited the cross-examination about drug dealing.

In light of the sparse evidence presented by defendant linking Joaquim's drug-dealing to a motive to burn down the Ames building, no showing that Joaquim knew that defendant had reported drug dealers to the DEA, and extensive opportunity for the defense to question Joaquim as to bias and motive on a variety of other issues for which there was an evidentiary basis, we find that the court did not abuse its discretion in excluding this line of questions.

■ Defendant also challenges the court's failure to grant a mistrial after the government asked him whether he had agreed to pay St. Louis' defense costs. St. Louis' attorney objected to this questioning and requested a mistrial on the ground that the information on which it was based was unreliable and misleading. The court sustained the objection but denied the mistrial, opting instead for a curative instruction which directed the jury to disregard the question because the government offered no evidentiary basis for it. Although joining in the request for a curative instruction, defendant's attorney did not join in the request for a mistrial, and at no time did he object to any portion of the instruction or allege its insufficiency.

■ Because the defense failed to raise this issue below, we review it only for plain error. *United States v. Crochiere*, 129 F.3d 233, 237 (1st Cir.1997). Even assuming the questioning was improper, we conclude that the court properly refused to grant a mistrial, and that it presented the jury with a comprehensive curative instruction, wholly satisfactory under the circumstances. "Declaring a mistrial is a last resort, only to be implemented if the taint [from improper information] is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." *United States v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir.1993). In this case, the questioning was brief, and the judge was careful to explain to the jury that (1) the question was improper; (2) there was no offered evidentiary basis for the facts suggested by the question; and (3) the question should be disregarded "entirely." As we presume that juries follow the court's instructions, and defendant has not shown that the questioning resulted in serious prejudice as required to overcome the presumption, *United States v. Rullan–Rivera*, 60 F.3d 16, 18 (1st Cir.1995), we conclude that the court did not commit plain error.

■ Finally, defendant contends that the court erred in using a base offense level of

twenty-four rather than twenty on the arson counts. The higher level applies if the defendant can be found to have knowingly created a substantial risk of death or serious bodily injury; the lower level applies where the "knowing" element is not met. U.S.S.G. §§ 2K1.4(a)(1), (2). Defendant was convicted for two separate acts of arson, based on evidence that he hired others to burn down a residential and commercial property to collect insurance proceeds. It does not follow that, as defendant contends, because the fires were carried forth in an "amateurish" fashion, his effort to burn a building in which people lived was anything other than a knowing creation of a substantial risk of death or serious bodily injury. We therefore reject the argument as without merit.

For the reasons stated above, we *affirm* the judgment of the district court.