# United States Court of Appeals
## For the First Circuit

Nos. 06-2746, 07-1087

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY BUCCI and DAVID A. JORDAN,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Howard, Circuit Judge,
Stahl, Senior Circuit Judge,
and Besosa, District Judge.[*]

Robert L. Sheketoff and Anthony Bucci, pro se, for appellant
Anthony Bucci.
Raymond J. Rigat for appellant David A. Jordan.
David A. Hollar, U.S. Department of Justice Criminal Division,
with whom Michael J. Sullivan, United States Attorney, was on brief
for appellee.

May 13, 2008

---

[*]Of the District of Puerto Rico, sitting by designation.

**STAHL**, <u>Senior Circuit Judge</u>. Defendant-appellant Anthony Bucci was convicted for conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine; possession with intent to distribute cocaine; and the use or carrying of a firearm during and in relation to a drug-trafficking crime. Defendant-appellant David A. Jordan was convicted of conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine; possession with intent to distribute cocaine; the use or carrying of a firearm during and in relation to a drug-trafficking crime; witness tampering; and three counts of making false statements to the Drug Enforcement Administration ("DEA").

## I.   BACKGROUND

To the extent that these challenges involve the sufficiency of the evidence, "[w]e recite the pertinent facts in the light most favorable to the verdict." <u>United States</u> v. <u>Downs-Moses</u>, 329 F.3d 253, 257 (1st Cir. 2003). Jordan and Bucci's other challenges do not involve serious factual disputes or do not demand immediate resolution on direct appeal.

On July 6, 2004, a grand jury returned an eight-count indictment[1] against Bucci, Jordan, and Francis "Skeeter" Muolo.

---

[1]Count 1 charged the defendants with conspiracy to distribute, and to possess with intent to distribute, over 500 grams of cocaine in violation of 21 U.S.C. § 846. Count 2 charged them with possession with intent to distribute over 500 grams of cocaine pursuant to 21 U.S.C. § 841(a)(1). Count 3 charged them with using

-2-

Muolo pleaded guilty to the conspiracy and possession charges of the indictment pursuant to an agreement with the Government. As part of this agreement, Muolo agreed to provide testimony against Bucci and Jordan (although he was not, in fact, called to the stand). He was sentenced to fifty-seven months' imprisonment.

This case involves the robbery of a drug dealer by other drug dealers, including Bucci, and Jordan, a police officer. Jordan, a member of the Malden, Massachusetts, Police Department since 1985, became a narcotics detective during the mid-1990's. In 2003, Jordan renewed an old acquaintance with an individual named Jon Minotti, a former corrections officer who worked in real estate and as a plasterer. At some time during their renewed relationship, Jordan began to purchase marijuana from Minotti, who dealt drugs to support his own habit. Jordan expressed anger to Minotti regarding the amount of money that cocaine dealers earned through their illicit trade.

Sometime during 2003, Minotti informed Bucci, another old acquaintance for whom he had recently performed plastering work,[2]

---

or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 9214(c)(1)(A). Count 4 charged Jordan with witness tampering, in violation of 18 U.S.C. § 1512(b)(3). Count 5 charged Bucci with another count of possession with intent to distribute cocaine. Finally, Counts 6 through 8 charged Jordan with making false statements to the DEA, in violation of 18 U.S.C. § 1001.

[2]Minotti and Bucci also engaged in several unrelated drug transactions. The district court, however, excluded evidence regarding these deals as unduly prejudicial. Thus, we will not

of his friendship with Jordan. Also during 2003, Minotti met yet another drug dealer, Carlos Ruiz,[3] from whom he periodically purchased ounce quantities of cocaine. Minotti introduced Bucci to Ruiz later that year, but told Ruiz that Bucci's name was "Gino."

In late November or early December 2003, while at the apartment of a friend, Bryan Raftery,[4] Bucci informed Minotti that he wanted to rob Ruiz, with whom he was angry. Bucci devised a plan in which Jordan would arrive to "bust" a drug deal between Minotti and Ruiz, allowing Minotti to escape with the drugs. Muolo, another friend of Minotti, was recruited as Minotti's getaway driver. Minotti relayed the proposal to Jordan, who initially expressed some reluctance at participating.

Undeterred by Jordan's lack of enthusiasm for the scheme, Bucci proceeded with alacrity. A few days before Christmas, Bucci directed Minotti to order three kilograms of cocaine from Ruiz on

consider them in our review.

[3]Ruiz pleaded guilty to a separate indictment. He received substantial sentence reductions in exchange for his testimony against Bucci and Jordan. Additionally, he received safety valve treatment for which he almost certainly would not have been eligible had the government disclosed information, adduced in this case, to the sentencing court concerning numerous threats Ruiz made against Minotti. The jury, of course, was entitled to credit Ruiz's testimony, which was mostly corroborated by reliable evidence, despite these inducements.

[4]Raftery, despite a grant of immunity, refused to testify at the defendants' trial and was held in civil contempt. He subsequently pleaded guilty to criminal contempt and was sentenced to probation.

his behalf.  On December 23, after some negotiations, Minotti and Ruiz settled on a price of either $27,000.00 or $28,000.00 per kilogram and agreed to meet at Minotti's house at 10:00 a.m. the next day to complete the transaction.  With time running short, Minotti again solicited Jordan's help.  Jordan, although still ambivalent, proposed that everyone involved in the prospective robbery meet in the parking lot of the Malden Medical Center the next day.

Around 8:30 a.m. on December 24, Bucci, in his black S500 Mercedes Benz, license plate number 3802YL, drove to Minotti's house.  Muolo apparently arrived separately.  From there, Bucci, Minotti, and Muolo drove in Minotti's vehicle, a black Chevrolet Avalanche, to the Medical Center.  There, they met Jordan, who was driving an unmarked police car, a tan Honda.  Despite some lingering reservations, he agreed to participate in the scheme in exchange for $30,000.00.  Jordan suggested that Minotti "escape" with the stolen drugs through a strip of woods adjacent to the Medical Center.  From there, Minotti could reach a nearby street, where Muolo would pick him up.  Bucci proposed that Jordan call for back-up to make the bust appear more realistic, but Jordan demurred.

Unbeknownst to the conspirators, the DEA had tapped Ruiz's phone as part of an ongoing, mostly unrelated narcotics investigation.  Around December 20, 2003, the DEA intercepted

communications between Ruiz and Minotti regarding the proposed transaction. In response, the DEA set up roving surveillance outside Minotti's residence, commencing at approximately 9:00 a.m. on December 24. At 9:10 a.m., DEA Agent Jean Drouin and Massachusetts State Police Sergeant Thomas Quin observed a black Mercedes parked in the driveway with license plate number 3802YL, but noted that Minotti's black Chevrolet Avalanche was absent. When the agents returned at 9:42 a.m., the Mercedes was gone, but Minotti's Avalanche had returned.

At 9:55 a.m., Ruiz arrived in a maroon Buick Park Avenue. Ruiz and Minotti left the house together in Ruiz's car to travel to the Medical Center. After a few seconds, however, Minotti instructed Ruiz to turn around, under the pretense that he had forgotten his cell phone. In reality, Minotti was experiencing doubts about the wisdom of robbing Ruiz. Leaving Ruiz in the car, Minotti called Bucci to express these concerns. Minotti told Bucci that the deal would not work anyway, falsely explaining that Ruiz wanted to be paid before relinquishing physical possession of the cocaine. Bucci instructed Minotti to hand over the phone to Ruiz. After a conversation between the two, which Minotti overheard, Ruiz agreed to bring all of the cocaine to the parking lot of the Medical Center, to permit Bucci an opportunity to test its quality.

When Minotti and Ruiz arrived at the Medical Center they pulled alongside Bucci's vehicle, which was positioned against a

-6-

rail, facing outward to the parking lot. Minotti exited the car, taking with him all three kilograms of cocaine. After observing Jordan's car entering the parking lot, perhaps twenty or third yards distant, Minotti immediately fled down an embankment into the woods carrying the three kilograms with him.

Jordan positioned his car directly behind Ruiz's Buick, blocking Ruiz (but not Bucci) from escape. Jordan, in plain clothes, exited the car, shouted "Malden Police," and pointed a gun at Ruiz. Jordan ordered both Ruiz and Bucci from their vehicles and frisked both men. Jordan searched Ruiz's car, examined his license, and performed a warrant check. He did not, however, perform any similar investigation of Bucci. Jordan then informed Ruiz, "It's your lucky day. I'm going to let you go. You have a merry Christmas." Ruiz returned to his car and left the parking lot. Jordan departed the parking lot as well, driving directly past Agent Drouin and Sergeant Quin's surveillance location. Bucci left his car and entered the Medical Center. A few minutes later, Jordan returned to the parking lot and drove to the entrance of the Medical Center. Bucci exited the Medical Center, and the two men had a brief conversation before going their separate ways.

Muolo and Minotti took the cocaine to Muolo's apartment in Stoneham. Once Bucci arrived, the conspirators opened one of the bags of cocaine. Taking the cocaine, Bucci indicated that he planned to sell it and split the proceeds with the others. Because

-7-

Jordan was impatient to receive his share of the money, Bucci, Minotti, and Muolo decided to give him whatever cash was available by the end of the night.

Later that afternoon, Ruiz and his brother-in-law, Armando Lovos, arrived at Minotti's house in a blue SUV. Ruiz suspected that the drug bust had been a setup, did not believe that Jordan was a real police officer, and was unsurprisingly furious with Minotti. Ruiz demanded that the cocaine be returned immediately. Minotti replied that he had abandoned the drugs in the woods and refused to return to search for them, ostensibly for fear that the police would be there. Still unsatisfied, Ruiz nevertheless left to search for the cocaine in the woods near the Medical Center. After Ruiz's departure, Minotti called Bucci to inform him of Ruiz's visit. Bucci suggested to Minotti that Jordan should confront Ruiz at the Medical Center to demonstrate his legitimacy. Minotti communicated this suggestion to Jordan, who agreed to look for Ruiz at the Medical Center.

At the Medical Center, Jordan encountered Ruiz and Lovos. Jordan took Lovos's identification, but did not run a warrant check. Instead, he simply instructed Ruiz and Lovos to leave the area. Recordings from the DEA's wire on Ruiz substantiate that Ruiz was convinced he had been ripped off and that he knew Jordan was not an honest policeman. In fact, Jordan's appearance only reinforced Ruiz's suspicions, as he rightly inferred that one of

the conspirators had tipped Jordan off that Ruiz and Lovos were returning to the Medical Center to search for the supposedly abandoned cocaine.

At about 10:15 p.m., Minotti received a voicemail from Bucci indicating that he had left money in a "blue tub" outside Minotti's back door. After finding the money, Minotti took $5,000.00 for himself to satisfy an unrelated debt and delivered the remainder to Jordan at his home. Jordan later complained that the black bag contained only $15,000.00 and demanded the rest of his payment. Bucci, again via Minotti, promised Jordan that he would receive the rest of his payment once Bucci was able to sell the cocaine.

On December 26, Jordan stopped by Minotti's house to make sure Minotti was unharmed, that Ruiz had not returned, and to ascertain when he would receive the rest of his money. Jordan instructed Minotti that, if questioned, he should tell law enforcement officers that he had been acting as an informant for Jordan in an attempt to catch Ruiz dealing drugs. Just then, Ruiz appeared at Minotti's home, accompanied by four or five henchmen. Jordan left, covering his face in an unsuccessful bid to avoid recognition.

Ruiz suggested that Minotti should get in the car with him. Under the pretext of getting his coat, Minotti returned inside to call Jordan for help. Jordan suggested that Minotti call

the police and complain about Ruiz trespassing, which Minotti did. When the police arrived, Minotti informed them of his ostensible role as Jordan's informant. The police instructed Ruiz, who eventually admitted to them that he was there to collect a drug debt, to leave.

At that point, Jordan apparently began to regret his role in the scheme. At 1:30 p.m. on December 26, Jordan called Agent Drouin to inquire whether Ruiz was under investigation. During this conversation, Jordan asked whether the DEA had attempted any surveillance of Ruiz on December 24. Because Agent Drouin already suspected Jordan of illegal activity, he told him that, while Ruiz was a target, no operation had taken place on that particular day. In an apparent effort to cover his tracks, Jordan informed Agent Drouin of certain, carefully-selected details regarding the drug rip-off at the Medical Center. Several of these details, however, were false.

Next, Jordan contacted Minotti and suggested that they return the cocaine to Ruiz or pay him for it. Minotti communicated to Bucci Jordan's desire to undo the robbery. Bucci responded that this rescission would be "stupid" and dangerous, as he believed trying to rescind the robbery would confirm Ruiz's suspicions about the rip-off, compounding their problems. At a meeting in Stoneham, Jordan returned a portion of his ill-gotten funds to Minotti, and instructed him to give the money to Ruiz. Despite his reluctance,

Bucci agreed to surrender his share of the proceeds to Minotti.  As Bucci and Minotti attempted to gather the rest of the cocaine, they received two frantic messages from Muolo indicating that something bad had happened.  When they arrived at Muolo's apartment, he informed them that he had flushed the cocaine down the toilet.[5] Minotti went home, took $2,000.00 of his wife's money, and met Ruiz at the Saugus mall to compensate him for the stolen cocaine.

In early May 2004, DEA agents arrested Ruiz.  Although Ruiz refused to cooperate fully against his suppliers in Mexico, he agreed to provide information regarding the drug rip-off.  He picked Minotti and Bucci out of a lineup.  Before Ruiz agreed to cooperate, Agent Drouin called Jordan to inform him of Ruiz's arrest, but Jordan expressed very little interest.

On May 19, 2004, Minotti encountered Muolo, supposedly by chance, at a Dunkin' Donuts.  Muolo told Minotti that the police had asked him to cooperate against Minotti.  He warned Minotti not to answer the phone if he called and asked to meet at a baseball field at 3:00 p.m.  Minotti relayed this information to Jordan, who instructed Minotti to tell Muolo to "keep his mouth shut" and indicated that he did not want to talk to Minotti anymore.  While Minotti waited for Muolo at their designated meeting place, DEA

---

[5]Later, Muolo informed Minotti that he had, in fact, given the cocaine to Bucci and lied to the others at Bucci's request.

-11-

Agent Mark Tully and Sergeant Quin approached Minotti, who agreed to cooperate by wearing a body wire to a meeting with Jordan.

Minotti arranged to meet Jordan at a skating rink in Malden. Although Jordan did not directly inculpate himself, he made a plethora of highly suspicious statements that strongly suggested that he was part of an unlawful conspiracy of some sort with Minotti, Bucci, and Muolo. The next day, May 20, Jordan attempted to speak with Minotti at his home, but Minotti refused to answer the door. Later, however, at Sergeant Quin's request, Minotti placed a recorded call to Jordan. During the call, Jordan expressed further concern about Muolo, directing Minotti to tell Muolo "not to give the bid out."

That same day, Agent Tully arrested Jordan. Agent Drouin, supported by several other officers, arrested Bucci outside of his wife's tanning salon in Malden as he attempted to enter his black Mercedes. After being informed of his rights, Bucci smugly taunted the officers, "You didn't get me on any phones." Eventually, Bucci's black Mercedes was seized and its contents were inventoried. Of particular interest, the vehicle contained ninety-one grams of cocaine dispersed in three separate plastic baggies that were contained within one larger bag; two digital scales; $6,653.00 in cash; four mobile phones and six separate SIM cards[6];

---

[6]A SIM, or "security identity module," card is the device within a phone that contains the unique information identifying a particular subscriber.

and a pager.  Officer Jamie Cepero, a Massachusetts state trooper assigned to the DEA task force, offered expert testimony regarding the contents of Bucci's black Mercedes.  He testified that the above-mentioned items were probative of drug trafficking.  Officer Cepero opined that the quantity of drugs found in Bucci's car, ninety-one grams, is inconsistent with mere personal use.  Cepero also testified that the contents of Bucci's car lacked indicia of personal use, such as straws, mirrors, and razor blades.

On April 12, 2006, following a trial, a jury returned a verdict of guilty against both Bucci and Jordan on all counts of the indictment.  On November 15, 2006, the district court sentenced Bucci to a term of 252 months' imprisonment and Jordan to a term of 180 months' imprisonment.  The defendants filed timely notices of appeal.

## II. ANALYSIS

### A. __Bucci__[7]

#### 1. Ineffective Assistance

Bucci contends that his trial counsel's performance was so deficient as to violate the Sixth Amendment and require reversal of his convictions. "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Leahy, 473 F.3d 401, 410 (1st Cir. 2007) (quoting United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (internal quotation marks omitted)). Nevertheless, in an exceptional case, the record may be adequately developed to permit meaningful review. Id. In this instance, however, we are unable to draw any reasoned conclusions from the cold record.

Bucci makes several fact-intensive complaints regarding his trial counsel's purportedly deficient performance. First, he asserts that trial counsel, in his opening argument, promised to

---

[7]Bucci has filed four pro se motions that remain pending. We deny Bucci's motion to supplement the record (Docket No. 102) and his motion to correct the trial transcript (Docket No. 152). These matters are better addressed by the district court on a petition for collateral review. We grant Bucci's second motion to supplement the record (Docket No. 128), given that the document in question has already been made a part of the record by the district court. It is not, however, pertinent to any issue pending before us. Finally, we deny Bucci's motion to file a supplemental reply brief (Docket No. 155). We require no further elaboration of his claims of error.

the jury that he would present an alibi witness, Lisa Murphy, who would testify that Bucci's activities on December 24 were inconsistent with the Government's theory of the case. Second, Bucci complains that trial counsel addressed the prospective testimony of Muolo during his opening statement, despite the fact that the Government did not indicate an intention to call Muolo during its own opening statement. Third, Bucci contends that trial counsel rendered deficient performance by failing to lay the foundation for and offer the testimony of Ross Minnoti, Jon Minotti's brother, who was purportedly willing to testify that Jon Minotti informed him that Bucci was innocent, and that he was only implicating Bucci to save his own skin. These three issues are best left for a collateral proceeding where Bucci will have the opportunity to develop the record to explicate his claim.

Lastly, we address trial counsel's closing argument. During closing, trial counsel was twice admonished for making improper remarks. First, trial counsel asked rhetorically, "If Br[y]an Raftery made those calls for Anthony Bucci, why didn't he come in here and tell you about them?" Following an objection by the Government, the district court gave a forceful limiting instruction, informing the jury that trial counsel's remarks were improper and that "the government had intended to call Mr. Raftery and he, Mr. Raftery, refused to testify. He is absent in this case because he refuses to be present." Later, trial counsel accused

the Government of knowingly and deliberately presenting perjured testimony. Again, the district court instructed the jury that trial counsel's actions were improper.

Undoubtedly, the limiting instructions issued by the district judge in response to trial counsel's remarks did little to advance Bucci's cause before the jury. At the same time, these events do not independently give rise to sufficient prejudice to merit reversal of Bucci's convictions. At worst, they may have cost Bucci some of the good will of the jury. The evidence against Bucci was overwhelming, and trial counsel's comments and the corresponding limiting instructions did nothing to add to the mountain of inculpatory evidence arrayed against him. Federal agents observed Bucci's vehicle at Minotti's house the morning of the rip-off; Bucci was observed by federal agents at the scene of the crime, parked alongside Ruiz; the agents observed Bucci speaking with Jordan outside the Medical Center immediately after the rip-off; and cocaine, two digital scales, $6,653.00 in cash, four mobile phones and six separate SIM cards, and a pager were found in Bucci's vehicle upon his arrest. Finally, of course, Minotti's and, to a lesser extent, Ruiz's testimony directly implicated Bucci in the crime.

## 2. Matters Related to Severance

Bucci argues that the district court erred by denying his motion to sever. At issue is Exhibit 24, a recording of a May 19,

2004, conversation between Bucci's codefendant, Jordan, and Minotti, in which Bucci's name is mentioned. The recording was properly introduced against Jordan as an admission. The district court ruled, however, that Jordan's statements were inadmissible hearsay in relation to Bucci. The district court denied Bucci's pretrial motion to sever as well as his trial motion to redact his name from the statements. To protect Bucci from unfair prejudice, the district court, on two separate occasions, instructed the jury that the statements were not admissible against Bucci. Bucci concedes that his Confrontation Clause rights were not violated because Jordan testified in his own defense at trial. California v. Green, 399 U.S. 149, 164 (1970) (holding that "the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making those statements"). Thus, the issue at hand is one of evidence rather than constitutional law.

We "review the denial of a motion to sever only for a manifest abuse of discretion." United States v. Page, ___ F.3d ___, ___, 2008 WL 820741, at *6 (1st Cir. Mar. 28, 2008). "[S]everance is particularly difficult to obtain where, as here, multiple defendants share a single indictment." Id. (quoting United States v. Casas, 425 F.3d 23, 37 (1st Cir. 2005) (internal quotation marks omitted)). To merit reversal on the basis of a district court's denial of severance, a "defendant must show

-17-

'prejudice so pervasive that a miscarriage of justice looms.'" United States v. Turner, 501 F.3d 59, 73 (1st Cir. 2007) (quoting United States v. LiCausi, 167 F.3d 36, 49 (1st Cir. 1999)). "[S]everance is particularly disfavored in conspiracy cases." Id.

As a general matter, we cannot say that the district court abused its wide discretion in refusing to grant separate trials at the outset of the proceedings. Our jurisprudence favors trying co-conspirators together, despite the reality that evidence admissible against one defendant may be, and often is, inadmissible with regard to others. See, e.g., id. We see no unusual circumstances that should have tilted the balance in favor of severance in this particular case.

Second, we address Bucci's contention that the district court committed reversible error by issuing a limiting instruction rather than redacting Bucci's name from the recording and the transcript provided to the jury. Even where the Confrontation Clause is implicated, we ordinarily presume that jurors will follow limiting instructions. United States v. Rodríguez-Durán, 507 F.3d 749, 769 (1st Cir. 2007). Occasionally, however, at least in the constitutional context, a limiting instruction will not be sufficient to preserve a co-defendant's rights where the extrajudicial statement is "powerfully incriminating" and "'inculpatory on its face.'" Id. (quoting United States v. Vega Molina, 407 F.3d 511, 520 (1st Cir. 2005)). "Statements that are

-18-

incriminating only when linked to other evidence in the case" do not merit such scrutiny.  Id. (quoting Vega Molina, 407 F.3d at 520) (internal quotation marks omitted).

The district court determined that Jordan's remarks, while powerfully incriminating as to Jordan, did not directly inculpate Bucci.  Significantly, defense counsel candidly and explicitly agreed with this assessment while arguing Bucci's motion to sever.  To be sure, Jordan's remarks were neither flattering nor helpful to Bucci's defense.  The recording contains numerous derisive references to Bucci as well as a discussion concerning whether Bucci had been arrested and whether he was providing information to law enforcement.  Thus, the recording surely implies that Bucci participated with Jordan and Minotti in an illicit undertaking of some species.  Nevertheless, we cannot say that the district court erred by refusing to redact the recording to exclude Bucci's name.  In light of our presumption that jurors follow limiting instructions such as those given here, the absence of constitutional error, and the inferential nature by which Jordan's statements link Bucci to the charged conduct, we find no abuse of discretion.  Moreover, any error was clearly harmless given the substantial evidence of guilt as described above.[8]

---

[8]Indeed, to the extent that Bucci claims that Jordan's statements were prejudicial because they were derogatory, we note that Bucci's own theory of the case rested on the premise that he was a drug addict rather than a drug dealer.

Finally, Bucci asserts that the prosecutor's closing remarks made it impossible for the jurors to follow the district court's limiting instruction. See Vega Molina, 407 F.3d at 522 (reversing conviction where prosecutor implored jury to infer defendant's guilt from codefendant's redacted confession). Because he failed to object at trial, we review this aspect of his challenge only for plain error. Rodríguez-Durán, 507 F.3d at 770-71. In large part, references to the May 19 conversation were restricted entirely to the prosecutor's discussion of Jordan. Neither the prosecutor nor the court were required to remind the jurors by rote, in each instance the recording was mentioned, that the recording was not admissible against Bucci. We think that the district court's two separate admonitions that the jurors should not consider the May 19 recording as evidence against Bucci were sufficient to prevent confusion.

Bucci argues that the prosecutor's final summation, when he called for a guilty verdict against both defendants, was improper. Following a brief discussion of Bucci's culpability, the prosecutor stated:

> David Jordan, ladies and gentleman, at every step of this case . . . David Jordan chose to stand on the side of the criminal instead of the side of law enforcement. On December 24th at the Malden Medical Center parking lot, on December 26th when he was not protecting Jon Minotti and his family from the men who showed up at his home, in each of the calls with Agent Drouin, and on . . . May 19 as well.

-20-

> Ladies and gentleman, the most compelling testimony in this case, the most compelling word in this case didn't come from Jon Minotti. The most persuasive testimony in this case didn't come from Carloz Ruiz. It didn't even come from the agents [who] testified in this case. Ladies and gentlemen, the most persuasive, the most compelling, and the most damning words in this case came from David Jordan's own mouth, both on that tape and when he got up on that witness stand and he lied to you.
>
> Ladies and gentleman, I ask you to find both of these men guilty beyond a reasonable doubt of all the counts.
>
> Thank you.

It is readily apparent, in context, that the discussion of the recording concerned Jordan alone. The prosecutor had already summed up his case regarding Bucci before discussing Jordan for the final time. By contrast, in Vega Molina, a case upon which Bucci relies, the prosecutor explicitly requested the jury to convict the defendant based on the co-defendant's out-of-court confession, over the objection of the defendant and without a limiting instruction. 407 F.3d at 522. In Richardson v. Marsh, 481 U.S. 200 (1987), to which Bucci also cites, the prosecutor argued that information gleaned from a codefendant's confession supported an inference of guilt. See id. at 205 & n.2. Here, the facts fall well short of showing such prejudicial conduct.

Finally, to the extent they did invite confusion, we see very little prejudice in the prosecutor's remarks. As detailed above, the evidence against Bucci was daunting and his theory of

innocence scarcely credible. Moreover, the recording was not highly incriminating of Bucci. While it suggested that Jordan did not consider him to be an exemplary citizen, the jury already knew that from the contents of his black Mercedes. Thus, the prosecutor's comments during closing argument do not warrant reversal of Bucci's convictions.

## 3. Courtroom Closures

In a separate pro se brief, Bucci maintains that reversal of his convictions is necessary because the district court committed structural error by closing the courtroom to the public on two occasions. Because Bucci failed to object at trial, we review only for plain error. See United States v. Thomas, Nos. 98-1051, 98-1052, 98-1116, 2000 WL 236481, at *2 (2d Cir. Feb. 14, 2000) (unpublished summary disposition) (applying plain error analysis to purported violation of defendant's right to public trial).

The Sixth Amendment guarantees criminal defendants the right to a public trial. Waller v. Georgia, 467 U.S. 39, 46 (1984); Owens v. United States, 483 F.3d 48, 61 (1st Cir. 2007). Bucci argues that the district court erred by closing the courtroom during jury selection and later during a contempt proceeding against Raftery. We decline to address his challenge to the purported closure during jury selection at this time because it is not yet ripe. Although Bucci has attempted to submit additional

-22-

evidence to supplement the Spartan record, it remains inadequate to permit meaningful review. Bucci will have an opportunity, if he so chooses, to present this argument in a petition for collateral relief before the district court. At that point, the district court may hold an evidentiary hearing to test the merits of Bucci's claim. See id. at 66.

Bucci also argues that the district court erred by closing the courtroom during the contempt proceeding against Raftery. During this hearing, the Government called its next prospective witness, Raftery, to the stand. As expected, Raftery refused to testify, despite a grant of immunity. He indicated that he was concerned about potential perjury charges due to conflicts between his anticipated testimony and the statements he made before the grand jury and federal agents. The district court placed Raftery in civil contempt and warned him of the possibility that criminal contempt charges might be filed against him should he not testify. Despite these remonstrations, Raftery persisted in his refusal to testify. At the end of the hearing, the district court ordered that Raftery be taken into immediate custody.

Bucci's argument is flawed in two ways. First, the Sixth Amendment's requirement that a trial be public does not apply with its usual force to criminal contempt proceedings. See Levine v. United States, 362 U.S. 610, 616 (1960). Here, the district court specifically indicated that Raftery would be set free if he agreed

-23-

to testify. Thus, the contempt order was civil, not criminal, in nature. See Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827-28 (1994). Civil contempt proceedings are not governed by the Sixth Amendment and require fewer procedural protections. See United States v. Winter, 70 F.3d 655, 661 (1st Cir. 1995) (stating that "a court may impose civil contempt sanctions pursuant to . . . minimal procedures" but that "criminal contempt sanctions may be imposed only if the court provides certain constitutional protections"); accord Santibáñez v. Weir McMahon & Co., 105 F.3d 234, 242-43 (5th Cir. 1997) (holding that protections of Sixth Amendment do not apply to civil contempt proceedings); Northeast Women's Ctr., Inc. v. McMonagle, 939 F.2d 57, 68-69 (3d Cir. 1991) (explaining that "arguments predicated on the Sixth Amendment are inapposite" to civil contempt proceeding); In re Di Bella, 518 F.2d 955, 958 (2nd Cir. 1975) (rejecting challenge to courtroom closure in civil contempt context). Consequently, not even Raftery himself, much less Bucci, could have invoked the Sixth Amendment right to a public trial during the civil contempt hearing.

Second, the contempt proceeding against Raftery was almost entirely collateral to Bucci's own trial and, thus, any closure did not infringe Bucci's Sixth Amendment right. See Petito v. Artuz, 69 F. App'x 26, 28 (2d Cir. 2003) (unpublished summary disposition) (rejecting defendant's Fifth Amendment challenge to

court's decision to exclude him from contempt proceeding against recalcitrant witness); United States v. Melchor Moreno, 536 F.2d 1042, 1047 n.7 (5th Cir. 1976) (explaining that "[t]he usual Sixth Amendment rights of cross-examination were only peripherally at stake here, since the hearing did not relate to guilt but to the collateral issue of whether [a witness's Fifth Amendment] privilege was properly invoked"); see also Brown v. Kuhlmann, 142 F.3d 529, 541 (2d Cir. 1998) (holding that courtroom closure during trial itself did not infringe defendant's Sixth Amendment rights where it involved cumulative testimony related to matter collateral to charged offense); United States v. Gallagher, 576 F.2d 1028, 1040 (3d Cir. 1978) (finding no error where trial judge cleared courtroom, not excepting even attorneys, to explore possible self-incrimination issues related to witness).

During this particular closure, no evidence was presented against either defendant; the defendants and their counsel were permitted to remain; and the courtroom was promptly reopened at the conclusion of the contempt proceeding. In the end, the temporal proximity and causal relationship between Bucci's criminal trial and the civil contempt hearing against Raftery did not necessarily render the two proceedings one and the same. Although Bucci undoubtedly enjoyed a right to compulsory process under the Sixth Amendment to call Raftery as a witness, he lacked any converse right to prevent him from testifying. Put differently, he had no

-25-

cognizable constitutional interest under the Sixth Amendment in Raftery's refusal to testify when called by the Government.  Thus, although it would have been better practice for the trial judge to have made specific record findings justifying his decision to close the courtroom, see Waller, 467 U.S. at 44-47, on these facts and under a plain error standard of review, Bucci suffered no constitutional deprivation.

4.  Constructive Amendment of the Indictment and Alleged Variances

Bucci argues in his pro se brief that the district court erred by permitting a constructive amendment of the indictment. Constructive amendments are forbidden by the Fifth Amendment, which guarantees defendants the right to be tried only on charges indicted by a grand jury.  U.S. Const. amend V; United States v. Fornia-Castillo, 408 F.3d 52, 66 (1st Cir. 2005).  "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction."  United States v. DeCicco, 439 F.3d 36, 43 (1st Cir. 2006).  To determine whether a constructive amendment has occurred, we examine whether the terms of the indictment were "altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them."  Id. (quoting United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (internal quotation marks omitted)).  Our review is de novo.  United States v. Hernandez, 490 F.3d 81, 83 (1st Cir. 2007).

Bucci also alleges two different but related variances between the indictment and the evidence adduced against him at trial. "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario limned in the indictment." United States v. Cianci, 378 F.3d 71, 94 (1st Cir. 2004) (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 12 (1st Cir. 2003) (internal quotation marks omitted)). A variance mandates reversal only where it is both material and prejudicial. Id.

In his brief, Bucci conflates his constructive amendment argument with his variance claim. Rather than engage in a futile endeavor to parse the two, we address them simultaneously. His underlying challenge lacks merit under either theory. First, Bucci asserts that while the indictment alleged a conspiracy to distribute cocaine, the evidence at trial supported only a conspiracy to commit robbery. Second, Bucci contends that the indictment was faulty because it failed to allege a Hobbs Act conspiracy. Bucci asserts that this failure prejudiced him because some of the jurors may have relied upon the drug rip-off to convict Bucci of conspiracy to distribute cocaine.

Bucci's challenges appear to rest upon two faulty premises. First, while it is possible that the evidence could have supported other charges, a grand jury is under no obligation to indict every conceivable crime potentially implicated by a

-27-

defendant's conduct.  The possible Hobbs Act violation Bucci describes is not mutually exclusive with the charges contained within the indictment.  Second, Bucci's argument consists of little more than utter speculation that the jury disregarded its instructions by convicting him of an uncharged offense.  Given the substantial evidence indicating that Bucci did, in fact, conspire to possess and distribute cocaine, we cannot infer that any jurors decided that Bucci did not conspire to possess and distribute cocaine, but convicted him of that offense, heedless of the law, on the basis that he conspired to commit robbery.  He has utterly failed to demonstrate either a constructive amendment of the indictment or a variance between the indictment and the evidence adduced at trial.  He cannot obtain relief on the counterintuitive theory that the jury could have convicted him of other, additional crimes that were neither charged nor detailed in the jury instructions.

5.  The Firearm Count

Next, in his pro se brief Bucci argues that the Government failed to introduce sufficient evidence for a properly instructed jury to convict him of Count 3 of the indictment, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  We review claims related to the sufficiency of the evidence de novo.  United States v. De La Cruz, 514 F.3d 121, 141 (1st Cir. 2008).

-28-

"The basic elements of a § 924(c)[] violation are '(1) that the defendant committed the predicate drug trafficking crime . . .; (2) that the defendant knowingly carried or used a firearm; and (3) that the defendant did so during and in relation to the specified predicate offense.'" United States v. Flecha-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004) (quoting United States v. Figueroa-Encarnacion, 343 F.3d 23, 30 (1st Cir. 2003) (alteration in original)). However, any particular defendant need not have physically carried the gun for liability to attach. See id. Rather, under Pinkerton v. United States, 328 U.S. 640 (1946), the Government may show "that a co-conspirator carried or used a firearm in furtherance of the conspiracy and that this was reasonably foreseeable to the defendant." Flecha-Maldonado, 373 F.3d at 179.

At trial, the Government relied on the theory that it was reasonably foreseeable to Bucci that Jordan would utilize a firearm during the drug rip-off. Bucci cites to United States v. Medina-Roman, 376 F.3d 1 (1st Cir. 2004), for the proposition that the government was required to prove that Bucci knew "to a practical certainty" that Jordan would carry or use a firearm in furtherance of the conspiracy. Id. at 5-6. Such reliance is mistaken. In Medina-Roman, the defendant was not notified of potential Pinkerton liability during her guilty plea and, thus, the Government was held to the higher standard associated with aiding and abetting.

Medina-Roman, 376 F.3d at 3 n.4, 6. Here, the district court properly instructed the jury concerning Pinkerton liability. See United States v. Sanchez, 917 F.2d 607, 612 (1st Cir. 1990) (holding that a "district court may give a Pinkerton charge even though the indictment does not plead vicarious liability"). There was ample evidence for the jury to conclude that Jordan's use of the firearm was reasonably foreseeable to Bucci.

Bucci's ancillary argument, that the Government failed to prove a conspiracy to commit a drug trafficking offense, is equally mistaken. The Government adduced sufficient evidence to convict Bucci of just such a conspiracy.

## 6. The Jury Instructions

Next, Bucci contends in his pro se brief that the jury instructions were erroneous because they presented the jury with an unfair Hobson's choice. He reasons that the instructions precluded the jury from finding Bucci not guilty of Count 3 because they provided for conviction based on either reasonable foreseeability or actual knowledge. This argument is absurd as a matter of basic logic. The jury could, of course, have found Bucci not guilty of Count 3 if it either (a) rejected the government's evidence of conspiracy or (b) determined that Jordan's use of the firearm in furtherance of the conspiracy was not reasonably foreseeable and that Bucci had no actual knowledge that it would be used. It is permissible for the government to present evidence of guilt tending

to demonstrate both actual and constructive knowledge.  See United States v. Griffin, Nos. 07-1475, 07-1477, ___ F.3d ___, ___, 2008 WL 1759161, at *5 (1st Cir. Apr. 18, 2008) (affirming conviction based on evidence of actual knowledge and willful blindness in tax evasion prosecution).

7. *Booker* Error

Finally, Bucci argues in his pro se brief that the district court's application of the Sentencing Guidelines violated the Sixth Amendment.  See United States v. Booker, 543 U.S. 220 (2005).  As an initial matter, we categorically reject Bucci's argument that the remedial Booker opinion was only a temporary fix subject to an expiration date.  While the remedial majority may have invited Congress to take independent action, see id. at 265, it contains no indication of eventual constitutional infirmity in the absence of a Congressional mandate.  More specifically, we have held that Booker requires reversal only where judicial fact-finding increases the statutory maximum penalty.  United States v. Antonakopoulos, 399 F.3d 68, 79 (1st Cir. 2005).  The 168 month sentence Bucci received for drug trafficking and the 84 month sentence he received for the weapons charge were both near the low end of the guidelines' ranges, far below the statutory maximums. Thus, Bucci's claim of Booker error is without merit.

B. **Jordan**[9]

Jordan contends that the district court erred by permitting the Government to redact portions of the recording and transcript of a December 24, 2003, conversation between Ruiz and Minotti. At trial, Jordan requested that the redacted materials be included pursuant to Rule 106 of the Federal Rule of Evidence for purposes of impeachment.

Jordan concedes that the rule against hearsay would have prevented him from independently offering these statements for substantive purposes. Rule 106, which codifies the common law doctrine of completeness, provides that

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106. We review a district court's rulings concerning Rule 106 for abuse of discretion. United States v. Millan, 230 F.3d 431, 434-35 (1st Cir. 2000). A defendant must show prejudice in order to obtain relief. See United States v. Awon, 135 F.3d 96,

---

[9]Jordan argues that the district court erred by determining that he was subject to a mandatory minimum on the weapons charge because he brandished the firearm during the drug rip-off. He contends that brandishing a firearm is an element of the offense and, therefore, the government was obligated to prove this fact to a jury in light of Booker. He acknowledges, however, that this challenge is foreclosed by our decision in United States v. Lizardo, 445 F.3d 73, 89-90 (1st Cir. 2006), and urges it merely to preserve his rights for further review.

101-02 (1st Cir. 1998), abrogated on other grounds by United States v. Piper, 298 F.3d 47, 57 n.5 (1st Cir. 2002).

Peculiarly, the Government maintains that the purview of Rule 106 is limited to the order of proof.  To the contrary, our case law unambiguously establishes that the rule of completeness may be invoked to facilitate the introduction of otherwise inadmissible evidence.  See United States v. Simonelli, 237 F.3d 19, 28 (1st Cir. 2001); Awon, 135 F.3d at 101.  Other circuits have held differently, see, e.g., United States v. Mitchell, 502 F.3d 931, 965 n.9 (9th Cir. 2007), but we adhere to our own precedent.

Nonetheless, the district court did not abuse its discretion by refusing to require the Government to present the redacted portions of the December 24 conversation.  Jordan contends that fairness required the admission of the redacted portions because they undermined the credibility of Minotti and Ruiz and because the excerpts were unduly fragmented and confusing.  Neither of these arguments is well-founded.

First, we address the issue of credibility.  As an initial matter, we note that the district court permitted defense counsel to use the redacted statements in cross-examination, and that defense counsel did so effectively.  Although timing may be important in some situations, we see no such prejudice here.  Moreover, the record is pellucid that defense counsel had abundant opportunity to impeach both Ruiz and Minotti on numerous different

grounds.  During the extensive cross-examination, defense counsel was able to reveal the witnesses' myriad (and typically self-serving) inconsistencies and general dishonesty; drug abuse; drug dealing and other lawbreaking; use of foul and offensive language; and the inducement provided by the Government.  Frankly, given the record before us, it is hard to imagine that the jury could have found either Ruiz or Minotti to be credible absent the corroboratory evidence supplied by the Government.  If the jury credited their testimony at all, it did so with full knowledge that both men were scoundrels motivated by the carrot of reduced sentences (and, in Ruiz's case, revenge).  Additional impeachment would have been cumulative.  Thus, the district court acted well within its expansive discretion by refusing to require the introduction of the redacted portions of the December 24 conversation pursuant to Rule 106.

Jordan's second contention fares only slightly better. On appeal, Jordan argues that the excerpts of the December 24 conversation are confusing, but he fails to point to specific portions that might suggest prejudicial ambiguity.  Having independently reviewed the evidence, we hold that any error was harmless.

We acknowledge that one excerpt might initially have generated some confusion.  The redacted transcript reads:

        [Ruiz]:  Look, first of all look . . . how did
        . . . the guy know that I was going to go back
        over there because somebody had to tell him.

        [Minotti]:  You're out of your mind.

                              . . .

        [Ruiz]:  I already told Tommy to get me his
        . . . address, if you don't give [it] to me[.]

Exh. 8(c) (second alteration in original).  In context, it is clear that Ruiz's first statement refers to his second encounter with Jordan at the Malden Medical Center, when he went back to the scene in search of his cocaine.  The second statement by Ruiz, as clarified by the redacted material, refers to Bucci.  Without the redacted portions, however, Ruiz's second statement appears to refer to Jordan instead.

        Nevertheless, the error was harmless.  First, it is difficult to see how the mistaken impression possibly caused by the excerpts might have prejudiced Jordan.  The evidence clearly established that Ruiz believed Jordan to be either a counterfeit or corrupt policeman.  Second, the Government actually clarified on direct examination that Ruiz was referring to "Gino," not Jordan.  Finally, as explained above, Jordan was afforded ample opportunity to correct any possible misapprehensions by extensive cross examination.

                        III.  CONCLUSION

        For the foregoing reasons, we affirm both Bucci's and Jordan's convictions and sentences.

-35-

<u>Affirmed</u>.