Andre D. MASON, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–767.

District of Columbia Court of Appeals.

Argued Jan. 20, 2011.
Decided Oct. 4, 2012.

Justin S. Antonipillai, with whom Kavita Kumar Puri, Washington, D.C., Sheri Shepherd, and Peter Roman were on the brief, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and S. Vinet Bryant, Assistant United States Attorney, were on the brief, for appellee.

Before FISHER and THOMPSON, Associate Judges, and RUIZ, Senior Judge.[*]

RUIZ, Senior Judge:

After the jury in a first trial was unable to reach a verdict, the jury in a second trial found appellant guilty of second-degree murder while armed[1] and weapons

---

[*] Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

[1] D.C.Code §§ 22–2103, –4502 (2001).

offenses[2] in connection with the death of Delonte Borum, who was shot in the back of the head while he was playing dice. Appellant challenges several evidentiary rulings that led to the admission of a prior consistent statement of a witness he claims had a motive to lie when the statement was made, records from the D.C. Jail that showed the movements of appellant and a government witness, and four telephone calls appellant made from the D.C. Jail. He also challenges the trial court's limitation of cross-examination of a government witness for anti-gay bias and the denial of appellant's motion to compel the government to reveal the identity of a confidential informant. We reject appellant's claims of error, except with respect to the limitation on bias cross-examination. However, we hold that the error was harmless. Accordingly, we affirm appellant's convictions.

## I. Facts

Early in the morning hours of April 24, 2007, Delonte Borum was shot and killed while he was playing a dice game in an alley in the 2900 block of 30th Street in Southeast Washington, D.C. Appellant was present, but not participating in the dice game. Jamie Irving, a friend of Borum and appellant, lived near the alley where the game was being played. She testified that she was outside that night drinking alcohol and smoking marijuana with a friend. As the night wore on, people began to leave the game. Appellant approached Irving. He demanded that she leave the alley and "go in the house" because he did not "need no witnesses." Shortly thereafter, from inside her apartment, Irving heard several gunshots and went back outside where she saw Borum lying in the alley.

Irving called 911, and within a few minutes several Metropolitan Police Department ("MPD") officers arrived. The officers saw that Borum had been shot three times from the back. They recovered two plastic drinking cups, dice, and some currency in the area around Borum's body. They also found three spent .380 caliber cartridge casings. No witness testified to having seen the shooting.

Two brothers, Miguel and Kevin Crouch, lived with their family in an apartment directly adjacent to the alley where the murder took place. The morning after the murder, MPD officers executed a search warrant of the Crouchs' apartment as part of an unrelated gun trafficking investigation. In the apartment, police found three guns, over 100 rounds of ammunition, and an unspecified amount of marijuana. Under Miguel's bed, the police found a .380 caliber handgun that ballistics experts determined to be the gun used to fire the bullets whose casings were discovered around Borum's body. The police arrested several members of the Crouch family and charged them with illegal possession of weapons and ammunition. Both Crouch brothers were questioned during the investigation of Borum's murder.

Investigators tested for fingerprints on the guns found in the Crouchs' apartment and on the items found at the murder scene. Appellant's fingerprints, which were on file due to a prior arrest, were not on the handgun or the ammunition found in the Crouchs' apartment, but they matched fingerprints recovered from one of the plastic cups found in the alley. However, when the discovery of these fingerprints was reported to the detective in charge of the investigation, it was mistakenly reported that appellant's fingerprints

---

**2.** Carrying a pistol without a license and possession of a firearm during a crime of vio- lence. D.C.Code § 22–4504(a), (b) (2001).

were found on bullets inside the suspected murder weapon. Additionally, the day after the murder, a confidential informant told the police that appellant had been hired by a rival of Borum to murder him. Although this tip, also, turned out to be unsubstantiated, appellant remained the focus of the investigation.

Miguel Crouch was arrested and charged in connection with the unregistered weapons and ammunition found in his family's apartment. Miguel testified that after he was released, he located appellant and asked him whether he had been in the Crouchs' apartment on the night Borum was killed. After some wavering, appellant admitted to Miguel that he had "smoked" Borum and had hidden the murder weapon under Miguel's bed because the situation had been "hectic." Kevin Crouch testified that he had been in his apartment the night of the murder and heard gunshots outside. Minutes later, he saw appellant in the Crouch family's apartment, walking from the direction of Miguel's bedroom.

Appellant was arrested and charged with first-degree murder for Borum's death. While awaiting trial, appellant encountered Arthur Jackson, another inmate in the D.C. Jail. Jackson testified at trial about conversations he had with appellant in jail. According to Jackson, appellant confessed that he murdered Borum and hid the murder weapon in a friend's apartment, where the police later discovered it; he also explained his concern that a female friend (presumably Irving) was "tattling on him."

Appellant was in the D.C. Jail for over a year before his first trial. During this time, he made numerous phone calls to friends and members of his family, all of which were recorded. In some of these calls he acknowledged being outside at the dice game the night Borum was shot, and expressed concern over whether others might implicate him as the murderer. He also conveyed apprehension about a false alibi he had given to the police. The government introduced parts of these phone call recordings into evidence during appellant's second trial.

A trial was conducted in October and November of 2008. On November 5, 2008, the court declared a mistrial after the jury was unable to reach a verdict. A second trial commenced on April 1, 2009. At the second trial, the government presented not only the evidence it had introduced at the first trial, but also evidence that was developed subsequently.

During the first trial, Miguel Crouch had been detained at the D.C. Jail on a material-witness warrant issued to secure his appearance as a witness for the government. According to Miguel, on the way from the jail to the courthouse on October 29, 2008, he and appellant were in adjacent holding cells. They were close enough to communicate, and appellant confronted Miguel about "snitch[ing]" and asked Miguel to change his story. Miguel described this conversation in his testimony at appellant's second trial.

On April 10, 2009, the jury in the second trial found appellant guilty of the lesser-included offense of second-degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. Appellant timely filed a notice of appeal.

## II. Discussion

### A. Prior Consistent Statement

Kevin Crouch appeared as a witness for the government. The following statements were introduced at trial:

1. On May 31, 2007, Kevin testified before a grand jury that he had seen appellant in his apartment the night Borum was shot, walking from Miguel's bedroom (where police were to discover

the murder weapon), approximately four minutes after he heard gunshots fired outside.

2. On March 29, 2009, prior to trial, Kevin told a defense investigator that it had actually been someone else, by the name of "DJ," he had seen in his apartment the night of the shooting.

3. On April 6, 2009, at appellant's trial, Kevin reverted to his earlier story that it had been appellant that he had seen in the apartment the night of the shooting.

The sequence in which the statements were presented to the jury is important to our discussion. First, the prosecutor elicited that Kevin saw appellant the night of the shooting, and that he had previously implicated "DJ" in an interview with the defense team. On cross-examination, defense counsel questioned Kevin about the statement he had made to the defense team. Kevin repudiated it by confirming that it was appellant whom he had seen inside his family's apartment on the night of the shooting. Defense counsel then impeached Kevin for bias to curry favor with the government: Kevin had recently been convicted of carjacking in Maryland, and had filed a motion to reconsider his sentence immediately prior to appellant's trial. Defense counsel mentioned several additional reasons Kevin might have to ingratiate himself with the government: (i) Kevin was arrested and charged with carrying a pistol without a license the day after Borum was shot, but was never prosecuted, (ii) Kevin's brother Miguel was threatened with prosecution for the murder of Borum, and (iii) in an unrelated 2008 prosecution for armed robbery, Kevin had been charged with twenty-one offenses carrying an aggregate of over 250 years in prison,

he pled guilty to only three charges, and received a shortened 54–month prison sentence.

The prosecutor recalled Kevin on redirect examination to rehabilitate his damaged credibility by asking Kevin why he had implicated "D.J." when he spoke to the defense investigator (because the investigator would tell appellant, Kevin replied) and eliciting that Kevin had subsequently identified appellant in a conversation he had with the prosecutor at the D.C. Jail. As the prosecutor began to ask Kevin about testimony he had given to the grand jury investigating Borum's killing two years earlier, defense counsel objected, asserting that it was an inadmissible prior consistent statement because at the time when he testified before the grand jury, Kevin had been motivated to lie by a desire to protect himself and his family from weapons charges, and his brother Miguel, from a murder charge. Defense counsel also argued that the grand jury testimony was unduly prejudicial.

The court permitted Kevin's rehabilitation with the grand jury testimony, reasoning that it would be misleading for the jury to hear about Kevin's recently filed motion to reconsider his sentence without letting the jury hear also that Kevin had made an earlier statement consistent with his trial testimony, long before he filed the motion to reduce sentence that the defense had used to impeach his credibility for bias. The court considered that the probative value of clarifying Kevin's statements would be high, whereas the prejudice to appellant would be relatively low because the prior consistent statement was relevant only to whether appellant was seen walking from Miguel Crouch's bedroom.[3]

---

3. On the next trial day, as the government prepared to read a brief excerpt from Kevin's grand jury testimony to the jury, defense counsel reiterated his objections. The trial court repeated its ruling from the previous day, commenting that there is no "blanket rule, that should the defense proffer a motive to lie which exists one second after the alleged offense in the case, that no subsequent accusation of recent fabrication can be rebutted by a prior consistent statement, ever."

The prosecutor then read an excerpt from Kevin's grand jury testimony to the jury stating that he saw appellant in the Crouch family's apartment just after the shooting. At defense counsel's request, the judge did not give a limiting instruction. Appellant challenges the admissibility of Kevin's grand jury testimony.

■ The general rule that prior consistent statements are inadmissible is well-settled:

> [P]rior consistent statements may not be used to bolster an unimpeached witness. *Daye v. United States*, 733 A.2d 321, 325 (D.C.1999). Such statements are generally inadmissible because " 'mere repetition does not imply veracity and ... once an inconsistency in statement is shown, evidence of additional consistent statements does not remove the inconsistencies.' " *Warren v. United States*, 436 A.2d 821, 836 (D.C.1981) (quoting *Scott v. United States*, 412 A.2d 364, 373 (D.C.1980)). There are, however, a number of exceptions to this rule. *Id.* Prior consistent statements may be used in rebuttal to "overcome a charge of recent fabrication by the witness." *Daye*, 733 A.2d at 325.

*Brown v. United States*, 881 A.2d 586, 599 (D.C.2005) (internal quotation marks omitted). This common law evidentiary rule has been codified at D.C.Code § 14–102(b)(2) (2001), which provides that

> [a] statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement

is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.

Appellant argues on appeal, as he did in the trial court, that the prior consistent statement would have been inadmissible if the witness's only motives to lie were the ones that pre-dated the statement—desire to avoid exposing himself and his family to criminal charges related to the weapons found in their apartment—and that it makes no sense to admit the otherwise inadmissible out-of-court statement simply because, in addition, the witness also had another reason, to want to curry favor with the government in light of a pending motion to reduce sentence. The government argues that the hearsay exception is more fine-gauged and admits a prior consistent statement if it meets "the particular charge of fabrication." Thus, the question of admissibility, according to the government, is not determined by whether the witness had any motive to fabricate when the out-of-court statement was made, but "turns on the fit between the statement and its ability to rebut the fabrication charge." At bottom, both parties' arguments come down to whether the out-of-court statement is relevant to rebut the charge of recent fabrication.[4]

■ Whether a prior consistent statement is properly characterized as admissible because it is not considered hearsay under the statute or comes within an exception to the hearsay rule "presents a

---

The court also noted that defense counsel could have simply impeached Kevin with "a very, very good prior inconsistent statement"—the statement to the defense investigator implicating "D.J."—but instead chose to also impeach Kevin with a new motive to lie that had arisen two weeks prior to trial. In so doing, the court ruled, defense counsel "teed-up" the issue for rehabilitation.

4. "Though the common phrase is 'recent' fabrication or contrivance, the term 'recent' is misleading. It is not required to be near in point of time to the trial, but only that the alleged contrivance be closer to the trial in point of time than the consistent statement." McCORMICK, EVIDENCE § 47, at 228 n. 36 (6th ed. 2006) (citing *People v. Singer*, 300 N.Y. 120, 89 N.E.2d 710, 711–12 (1949)).

question of law that this court considers *de novo.*" *Brown,* 881 A.2d at 599. The legal issue before us is one we have not expressly addressed: whether and, if so, under what circumstances, a prior consistent statement, made when the witness had a motive to lie, may be admitted to rebut a charge of fabrication alleged to have been motivated by a more recent, and different, motive.[5]

The California Supreme Court faced a similar sequence of impeachment and rehabilitation of a witness in *People v. Hayes,* 52 Cal.3d 577, 276 Cal.Rptr. 874, 802 P.2d 376 (1990). In *Hayes,* a witness testified against the defendant. *Id.,* 276 Cal.Rptr. 874, 802 P.2d at 394. On cross-examination, the defense impeached the witness with criminal charges currently pending against him. *Id.* On redirect, the prosecution rehabilitated the witness with prior consistent statements he made before the criminal charges were brought, but while the witness admittedly had other motivations to lie (he was on probation at the time and had been a suspect in the investigation). The California Supreme Court affirmed the trial court's decision to admit the statements, holding that "a prior consistent statement is admissible if made before the existence of *any one or more* of the alleged biases or motives that, according to the opposing party's express or implied charge, may have influenced the

witness's testimony." *Id.,* 276 Cal.Rptr. 874, 802 P.2d at 395 (emphasis added).

*Hayes* is at odds with *United States v. Awon,* 135 F.3d 96 (1st Cir.1998). In *Awon,* a defendant was tried for arson. Two of his accomplices testified against him at trial. On cross-examination, defense counsel impeached each witness by eliciting their desire for leniency in their own prosecutions for the same arson. On redirect, over the defendant's objection, the government rehabilitated each witness with prior consistent statements that each had made to government investigators months before trial. *See id.* at 99–100 (citing FED.R.EVID. 801(d)(1)(B)). The defendant argued on appeal that the prior statements should not have been admitted because the witnesses had the same motive to fabricate—obtaining more lenient treatment—both before and after they made the hearsay statements. The government countered that the defense had pointed to additional grounds for bias that arose after the prior consistent statements had been made, and that the prior consistent statements were admissible to rebut the more recent grounds for the alleged fabrication, even if each witness already had a motive to lie at the time the out-of-court statements were made.[6] The First Circuit held that the admission of the statements was improper, characterizing each of the "new" motives on which the government's argu-

---

**5.** We disagree with appellant's contention that this case is controlled by our decisions in *Williams v. United States,* 483 A.2d 292 (D.C. 1984), and *Reed v. United States,* 452 A.2d 1173 (D.C.1982), where we held the witnesses' prior consistent statements were inadmissible because the witnesses already had a motive to lie when the prior consistent statements were made. Those cases did not involve a witness who had different motives to fabricate. In both cases the witnesses had been impeached for bias as they were awaiting sentencing after having pled guilty to reduced charges or having charges dropped in

connection with the same crime for which the defendant was prosecuted.

**6.** Before the consistent out-of-court statements were made, the witnesses were motivated by their desire not to be charged or deported if they cooperated with the police. Subsequently, the government argued, the witnesses had acquired "additional" motives to fabricate: desire for release from incarceration as a material witness, dispensation in a different and new matter, influence exerted by a government agent during pretrial preparation, and anticipation of a lesser sentence after testimony. *Awon,* 135 F.3d at 100.

ment relied as just "smaller subsets of the larger theme"—a "general desire not to be jailed." *Id.* at 100. Because the various motives to lie that post-dated the out-of-court statements could not be differentiated in any meaningful way from the motive that pre-dated the statement, the reason to fabricate the out-of-court statement and the trial testimony remained essentially the same. *Id.* (citing *United States v. Albers*, 93 F.3d 1469, 1482–84 (10th Cir. 1996)). Therefore, the prior consistent statements were not admissible to rebut a charge of recent fabrication. *See also Tome v. United States*, 513 U.S. 150, 156, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (holding that to be admissible under Fed. R.Evid. 801(d)(1)(B) a prior consistent statement must predate the motive to fabricate).

Under the facts of the case before us, we think that the prior consistent statement was admissible to rebut a charge of a very recent and different reason to fabricate.[7] To be clear, there may well be circumstances where allegedly "different" motives to fabricate are more properly characterized as "smaller subsets of [a] larger theme," *Awon*, 135 F.3d at 100, but this is a distinction that we need not address here. Where the relevant ground of impeachment involves an independent criminal action arising in a different juris-

diction,[8] which has had a significant fabrication-inducing development just two weeks prior to trial (in this case, the filing of a motion for resentencing), it is accurate to label the new motive to fabricate as "different." Accordingly, Kevin's prior consistent statement made to the police shortly after the shooting was admissible to rebut defense counsel's charge that he had a current reason to curry favor with the government notwithstanding that the witness also had other, unrelated motives to lie at the time the statement was made. It is critical to our analysis that the jury was well aware of those other motives, and thus able to weigh the prior consistent statement accordingly. We also note that the jury instructions included a proper explanation of the difference between a prior inconsistent statement and a prior consistent statement.

There is also an important distinction between the facts at hand and the facts in both *Hayes* and *Awon*. Prior to the admission of Kevin's prior consistent statement, the defense had elicited a prior *inconsistent* statement—Kevin's statement to the defense investigator implicating "D.J."—and then attempted to explain Kevin's trial testimony implicating appellant by reference to an intervening motive to lie. This combination, without more, would have

---

7. This court approved of *Hayes* by way of a single citation in *Tyer v. United States*, 912 A.2d 1150 (D.C.2006). In *Tyer*, the defense impeached a witness on cross-examination, by implying that he had been subjected to undue pressure by the prosecutor prior to trial. On redirect, the prosecutor rehabilitated the witness with prior consistent statements made to investigators just after the crime, but admittedly after several hours of intense questioning by detectives who did not believe the witness's version of events. We held that this was proper because the prior consistent statements were made "long before [the witness] had any contact with the prosecutor—and thus long before the prosecutor had an opportunity to exercise any influence

at all, proper or improper." *Id.* at 1161 (citing *Hayes*, 276 Cal.Rptr. 874, 802 P.2d at 395). Although the court did not address in *Tyer* whether any biases resulting from pressure from the detective's earlier questioning, before the out-of-court statement was made, were the same or different from the biases resulting from the alleged pressure from the prosecutor's later questioning, just before the consistent trial testimony, the court's reference to a different source of pressure, close to the time of trial, implies that the court thought the witness's motivations were sufficiently different.

8. Kevin Crouch's carjacking offense was prosecuted in a Maryland state court.

strongly suggested to the jury that Kevin had fabricated his trial testimony. As explained by the trial court: "It would be extremely misleading to permit the jury to conclude that the only pronouncement that the witness has ever made about this case was the one he made to the [defense] investigator, and that the reason he's now changed his testimony is an intervening discussion with the prosecutor and concern about his own sentence." We agree with the trial court. If one party could impeach a witness with the later motive to fabricate, no matter how powerful it may be, knowing full well that the other party would be prohibited from rehabilitating that witness with prior consistent statements, the overall impact of the witness's impeachment would be rendered misleading. Where the jury has been exposed to the witness's motive to fabricate both before and after the prior consistent statement was made, the better rule is to allow counsel to argue their inferences to the jury and let jurors weigh the evidence.

■ Having decided, as a matter of law, that the prior consistent statement was not inadmissible hearsay, we defer to the trial court's decision to admit the statement as more probative than prejudicial. *See (William) Johnson v. United States,* 683 A.2d 1087, 1095 (D.C.1996) (en banc). The trial court found that the admission of Kevin's prior consistent statement was highly probative insofar as it clarified the misleading impression that would have been created if the jury had thought that Kevin's only other statement had been the one he made to a defense investigator two weeks before trial, identifying someone other than appellant ("D.J.") as the person he saw coming from the room where the murder weapon was found, when, in fact, shortly after the murder, he had identified appellant. The trial court did not abuse discretion in finding that the probative value of the statement was not substantially outweighed by any prejudice to appellant, particularly as appellant was able to expose all of Kevin's prior motives to lie. We therefore find no error in the court's admission of Kevin Crouch's grand jury testimony.

### B. Cross–Examination Regarding Bias

■ During Kevin Crouch's grand jury testimony, the prosecutor asked about a nickname, "Faggy Dre," by which appellant was then known.[9] At trial, defense counsel attempted to cross-examine Kevin about his use of the "Faggy Dre" nickname to refer to appellant. The trial court did not permit counsel to do so.

Defense counsel argued that the use of the nickname, coupled with Kevin's observation that appellant had "feminine ways," could be used to impeach Kevin for anti-homosexual bias. The trial court disagreed, noting that there was no indication that the nickname was negative or used in a pejorative way. The trial court also thought that Kevin's use of the nickname did not suggest that "there's such a negative view about [appellant] that [Kevin would] lie about him in a murder trial," adding that "without more I'm just not going to let you go there." Appellant ar-

---

9.

Prosecutor: Okay, so I want to take you back to three years ago when you lived on Hartford Street. At that time, did you know somebody they called Dre?
Kevin: Yes.
Prosecutor: Okay. Now did they just call him Dre or what did they call him?
Kevin: Faggy Dre.

Prosecutor: Faggy Dre? F-a-g-g-y?
Kevin: Yes.
Prosecutor: Now, let me ask you this: Do you know why they called him Faggy Dre?
Kevin: Because he had feminine ways.
Prosecutor: Okay. And was that a name that he liked?
Kevin: Not that I know.

gues that the trial court abused its discretion in so limiting counsel's cross-examination, because Kevin's use of the nickname "Faggy" reflected the type of bias that could have affected his testimony.

The Sixth Amendment protects the right of the accused in a criminal trial to confront and cross-examine adverse witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "A witness' bias is always a proper subject of cross-examination. 'Accordingly, evidence that tends to show bias, even if extrinsic to issues raised on direct examination, should be admitted.'" *McCoy v. United States*, 760 A.2d 164, 174 (D.C.2000) (quoting *Scull v. United States*, 564 A.2d 1161, 1165 (D.C.1989)). "When reviewing a trial court's decision to limit a defendant's cross-examination, 'the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial.'" *See Flores v. United States*, 698 A.2d 474, 479 (D.C.1997) (quoting *Springer v. United States*, 388 A.2d 846, 856 (D.C. 1978)). If the trial court, over defense counsel's objection, improperly limited the scope of defendant's cross-examination to an extent that infringed upon his constitutional right to confront witnesses, we review the court's ruling under "the harmless constitutional error standard" of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Flores*, 698 A.2d at 479. "Where the trial court erred in limiting cross-examination, but the error is not of constitutional dimension, reversal will only be required if we conclude, upon consideration of the totality of the circumstances, that the error caused significant prejudice." *Id.* (citing *(James) Johnson v. United States*, 398 A.2d 354 (D.C.1979)).

The question before the court was not whether "to allow defense counsel to plunge ahead with his involved exploratory cross-examination or to halt the inquiry *ab initio*." *United States v. Gambler*, 662 F.2d 834, 839 (D.C.Cir.1981). It need not have been all-or-nothing and we agree with appellant that the trial court should have allowed *some* degree of questioning about the possibility of anti-homosexual bias. A trial court may limit cross-examination to "prevent harassment, prejudice, confusion of the issues, or repetitive, cumulative, or only marginally relevant questioning, to avert danger to or the humiliation of a witness, or [t]o guard against the danger that counsel will ask highly prejudicial questions of witnesses with the almost certain knowledge that the insinuations are false." *Scull*, 564 A.2d at 1164 (internal quotation marks omitted). Here, there was none of that because the court precluded all cross-examination about appellant's nicknames. The trial court should have allowed cross-examination until the questioning risked getting off-track, becoming unduly burdensome or out of proportion to the issue at stake.

The trial court's ruling was based on an assessment of the force (or, rather, perceived lack of force) of the bias that, the court thought, cross-examination would reveal. Similarly, the government argues on appeal that evidence of actual bias was scant because Kevin's grand jury testimony simply described the nickname appellant was known by in the community. The prosecutor asked Kevin what "they" called appellant, and Kevin told her. Kevin's explanation was that appellant was called "Faggy Dre" because he was thought to have "feminine ways." That appellant was known by a nickname that could indicate homophobia, argues the government, does not automatically mean that Kevin har-

bored such bias against homosexuals.[10] That may well be so, but there is no way to know. Before the grand jury, Kevin was responding to a direct question posed by the prosecutor about what "they" called appellant. What is missing is any exploration of Kevin's own views and feelings on the subject, and of how strongly he held them. That is the purpose of bias cross-examination. "Given that our 'lenient' case law requires only a proffer of 'some facts which support a genuine belief that the witness is biased in the manner asserted,' or a 'well-reasoned suspicion ... to support the proposed [questioning],'" *Smith v. United States,* 26 A.3d 248, 262 (D.C.2011) (alteration in original) (quoting *Brown v. United States,* 683 A.2d 118, 124–25 (D.C.1996)), examination into the possibility that Kevin was biased against appellant because of his "feminine ways" should not have been precluded. Accordingly, the trial court erred in limiting cross-examination.

▮▮▮▮ Nevertheless, we can conclude that the error was harmless. *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. To find harmless error, "it must be clear beyond a reasonable doubt (1) that the defendant would have been convicted without the witness'[s] testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness'[s] testimony." *Scull,* 564 A.2d at 1166 (internal quotation marks omitted); *accord, Jenkins v. United States,* 617 A.2d 529, 533 (D.C. 1992). This case fits into the latter category. As discussed in the previous section, appellant impeached Kevin Crouch on the grounds that: (i) Kevin was originally charged with carrying a pistol without a license, only to have these charges dismissed; (ii) Kevin's brother Miguel had

been a suspect in the murder; and (iii) Kevin obtained a very lenient sentence in his conviction for armed robbery. If those powerful reasons, born of self-interest, did not undermine Kevin's credibility with the jury, it is doubtful that additional cross-examination for anti-homosexual bias in a murder case that does not in any way implicate homophobia would have significantly diminished the jury's perception of Kevin's credibility. *See United States v. Maxwell,* 579 F.3d 1282, 1296–98 (11th Cir.2009) (finding harmless error where several other sources of bias had already been elicited during cross-examination of witness); *Gambler,* 662 F.2d at 839–40 (same).

### C. Admission of Jail Movement Records

▮▮▮ Appellant was incarcerated in the D.C. Jail during the first trial, from October 28 to November 3, 2008. Miguel Crouch, who testified against appellant at the first trial, was also incarcerated during the trial because he was being held on a material-witness warrant to secure his testimony. The D.C. Jail contains an area known as the receiving-and-discharge ("R & D") unit, where prisoners are held temporarily before being moved out of the building. One morning during the first trial, both Miguel and appellant traveled from the D.C. Jail to the Superior Court—appellant to attend his own trial, Miguel to testify on behalf of the government. At appellant's second trial, Miguel testified that he and appellant had been placed in different holding areas in the R & D unit, but close enough to communicate. Appellant asked Miguel whether he "snitched" on him. Miguel replied "I ain't snitch on you, I told the truth on you." Appellant followed with, "you're going [to] change your story, right?" Miguel refused.[11]

---

10. *Cf. Moreno v. United States,* 482 A.2d 1233, 1237–38 (D.C.1984) (holding that witness's expressed general racial bias suffices to per-

mit cross-examination for bias against defendant on the basis of his race).

11. As a result of this conversation, on March

On direct and cross, Miguel stated that the conversation occurred on October 29, 2008. According to Sgt. Menefee, a D.C. Jail litigation coordinator, the jail's movement records indicated that it was unlikely, though not impossible, that Miguel and appellant encountered each other in the R & D unit on October 29, 2008. On that day, the records showed, appellant entered the R & D unit five hours before Miguel, and it was unlikely that he would have remained there long enough for them to encounter one another.[12] The government sought leave from the court to question Sgt. Menefee regarding the jail movement records for the previous day, October 28, 2008. Defense counsel objected on relevancy grounds, because Miguel had testified that the conversation took place on the 29th, rendering the October 28th records irrelevant. Before the court ruled on the objection, the prosecutor agreed to "just move on."

On the next trial day, the trial judge *sua sponte* questioned whether the records from the 28th should be admitted into evidence.[13] The prosecutor explained that Miguel had been transported from the D.C. Jail to the Superior Court on both October 28th and 29th and that it was possible that Miguel's recollection of an event that occurred five months before his testimony could have been "off by a day." Defense counsel objected again on relevancy grounds.[14]

The trial judge decided to admit the records, noting that the relevancy threshold is "fairly low" and that the records for October 28 could be quite relevant because they indicated that on that day Miguel and appellant entered the R & D unit within a minute of each other. The judge thought "it would be misleading, frankly, to ask a jury to conclude that [the conversation] never happened, and withhold this evidence from the jury." The judge also stated that the records would not be "a vehicle for speculation" because "a reasonable juror could conclude that [Miguel] Crouch had his facts right and his date wrong by one day." The records for October 28 were admitted into evidence.

 On appeal, appellant reiterates his argument that the movement records were irrelevant and that their admission into evidence allowed the jury to speculate about an event that never happened. We disagree. "The test for relevance is a minimal one." *Lazo v. United States,* 930 A.2d 183, 185 (D.C.2007). As we have explained:

> Evidence is relevant if it makes the existence of a contested fact that is of consequence to the determination of [an] action more or less probable than it would be without that evidence. But [o]rdinarily, any evidence which is logically probative of some fact in issue is admissible ... unless it conflicts with some

25, 2009, a grand jury indicted appellant for obstruction of justice. The government informed appellant that they intended to introduce this evidence during their case-in-chief in appellant's second murder trial. This charge was dismissed once appellant was convicted.

**12.** The records document when prisoners enter the R & D unit, but not when they leave; typically, according to Sgt. Menefee, prisoners are moved out of the unit and into a vehicle after a relatively short waiting period.

**13.** The trial judge noted that she still had not ruled on the government's request to admit those records and invited the government to offer reasons why the records could be relevant.

**14.** Defense counsel argued that Miguel clearly indicated that the conversation took place on the 29th. According to defense counsel, allowing the jury to view the records from the 28th would cause improper speculation that Miguel and appellant had a conversation other than the one that Miguel testified took place.

settled exclusionary rule. [I]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury.

*Dockery v. United States,* 746 A.2d 303, 306–07 (D.C.2000) (internal quotation marks and internal citations omitted). "[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Mercer v. United States,* 724 A.2d 1176, 1185 (D.C. 1999) (citing *(William) Johnson,* 683 A.2d at 1095).

The R & D movement records shed light on a contested fact—whether appellant confronted Miguel Crouch about "snitching" and asked him to change his story— and made it more probable that the conversation took place than it would have been without that evidence. The discrepancy between the dates on the records and Miguel's testimony led to one of two possible conclusions—either Miguel was lying and the conversation never occurred, or he was mistaken about the date. The latter possibility was a reasonable inference, based on the records, not speculation. As noted by the trial court, defense counsel was "free to argue that [Miguel] was certain [the date] was the 29th and that it's one more inconsistency that undermines his credibility," and defense counsel did so during his closing argument. The jury was presented with evidence from which it

could evaluate Miguel's credibility. Accordingly, the trial court did not abuse discretion in admitting the jail records.[15]

## D. Admission of Appellant's Recorded Phone Calls

While appellant was incarcerated, he made a number of phone calls to friends and relatives that were recorded by the jail as a matter of course. Prior to the first trial, the government identified several calls where appellant made statements that arguably demonstrated his consciousness of guilt or his knowledge of the crime. The government informed the defense that it intended to introduce these recordings into evidence.

Appellant filed a motion *in limine* to exclude four of the recordings. The motion cited several grounds for exclusion: lack of relevance, undue prejudice, and hearsay. In response, the government argued that the call excerpts were relevant to the issue of appellant's guilt, and were far more probative than prejudicial. As for hearsay, the government acknowledged that the calls contained third-party statements, but argued that these statements were admissible either because they were not being admitted to show the truth of the matter asserted, or because they were adoptive admissions by appellant. At a pretrial motions hearing, the court and parties reviewed the phone call transcripts and the court granted the government leave to introduce certain excerpts of the

15. Appellant makes two other arguments about the jail records. He argues that they were introduced after Miguel and Sgt. Menefee had already testified, depriving him of the opportunity to cross-examine them about events that may have occurred on the 28th. Specifically, appellant argues that the jury might have been led to speculate about the existence of an entirely *different* conversation based on the October 28th records. We think that this is an inaccurate characterization of

what happened. The records allowed the jury to consider the possibility that the *same* conversation Miguel recounted occurred on the day before; that was the conversation that counsel questioned the witness about. Appellant also argues that the records were admitted without proper foundation. That assertion is belied by the record as the October 28th and 29th records are on the same sheet of paper and were properly authenticated during Sgt. Menefee's testimony.

calls. Those recorded excerpts were admitted during the first trial.

The government also proposed to introduce the recordings into evidence at the second trial. Defense counsel objected again on grounds of relevance.[16] The court found "[t]he conversations are all cryptic, but it is a reasonable inference from each that the government's interpretation is right, that ... they are sufficiently relevant to suggest in each of the calls that the defendant is discussing matters related to this case." The recordings were admitted into evidence. Certain excerpts were eventually played several times, including during closing arguments, and, at the jury's request, during jury deliberations.

Appellant continues to argue on appeal that the recordings should not have been admitted into evidence because they contained inadmissible hearsay and were more prejudicial than probative.[17]

 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted." *Patton v. United States,* 633 A.2d 800, 808 (D.C.1993) (quoting Fed.R.Evid. 801(c)). "Hearsay evidence is generally not admissible at trial, unless it falls under one of the 'exceptions to the hearsay rule that provide for the admission of statements because they exhibit certain indicia of reliability that overcome or outweigh the normal risks associated with the inherent dangers of hearsay statements.'" *Id.* (quoting *Laumer v. United States,* 409 A.2d 190, 194 (D.C.1979) (en banc)).

 Appellant cites two conversations that he asserts constitute hearsay. In the first, appellant and Juanita, appellant's cousin, discussed Jamie Irving's grand jury testimony.[18] On the second, appellant spoke to Delonte Haskins, a friend who had been at the dice game shortly before the murder.

In the call with Juanita, appellant repeated his lawyer's statement that the court typist might have added words to the transcript of Irving's testimony, for explanation, that had the effect of making it appear as though Irving herself said things she did not. While this was admittedly an out-of-court statement made by appellant's attorney, and was therefore third-hand, it was not offered to prove the truth of the matter asserted. As the government discussed in closing argument, this part of the conversation was admitted to show appellant's guilty state of mind. There was no reference to the purported truth of

16. Appellant also claimed that admission of the call excerpts would violate his Fifth Amendment privilege against self-incrimination. Appellant's argument in this regard was that, although the content of the calls was innocuous, the government would misleadingly suggest that they were probative of guilt. As a result, appellant argued, he would feel compelled to testify to rebut the government's interpretation of the calls. Appellant made this argument orally at the hearing on the motion *in limine* before the first trial. At the second trial, the court again denied the identical Fifth Amendment-based objection. Appellant does not make this argument on appeal and we express no opinion as to the merits of such an argument.

17. The government argues that appellant's hearsay objection should be reviewed for plain error and not abuse of discretion because even though appellant filed a motion *in limine* to exclude the recordings on hearsay grounds, the trial court had not ruled, and at trial appellant objected only on Fifth Amendment and relevance grounds. Because our *disposition of this issue would be the same* under either standard of review, we will treat it as having been properly raised (in appellant's motion *in limine*) and preserved (as evidenced by the trial court's discussion of the issue at trial).

18. Irving is the person in the alley that appellant told to go inside, before the shots rang out.

the lawyer's alleged statement that the typist might have mistakenly put words in Irving's mouth, which, if anything, would have benefitted the defense. We therefore conclude that because this statement was not offered for the truth of the matter asserted, it was not hearsay. *See Mercer v. United States,* 864 A.2d 110, 118 (D.C. 2004) (" 'If a statement is not offered to prove the truth of the matter asserted it is not hearsay' " (quoting *Burgess v. United States,* 786 A.2d 561, 570 (D.C.2001))).

Appellant also objects to Juanita's statement, made in the same conversation, describing Irving's testimony that appellant had told her "take the cup." The implication was that appellant instructed Irving to take her cup of alcohol with her and go inside so she would not be a witness to the murder he was about to commit. Irving made this exact statement in the courtroom on direct. Juanita's third-hand restatement gave context to the phone call, which was offered to show appellant's concern that Irving was "snitching" on him and, by implication, his consciousness of guilt. The prosecutor did not refer to Juanita's statement as truthful in closing argument or when the call was played at trial. As this statement also was not offered for its truth, it was not hearsay. *Mercer,* 864 A.2d at 118.

■ Finally, appellant objects to a statement from a conversation he had with Haskins in which they discussed the evidence against appellant. In the conversation, Haskins tells appellant, "I heard they got everything," in reference to the weapons and ammunition seized by police at the Crouchs' apartment. Haskins then clari-

fies, "[t]hey got everybody else['s] stuff, but not his," implying that the police recovered evidence that implicated others, but not Miguel Crouch, in various crimes. Miguel was not charged in connection with the shooting,[19] whereas appellant was charged with Borum's murder—a prosecution aided by the .380 caliber handgun found under Miguel's bed. Appellant replied, "that's shady right there," suggesting that members of the Crouch family may have assisted the government's investigation of appellant in exchange for the government's dismissal of criminal charges against them. Haskins also told appellant how he explained to Detective Lee Littlejohn, the lead investigator in the case, that Haskins did not witness the murder and left the scene before Borum was killed.[20] Appellant argues that Haskins's account of his conversation with Detective Littlejohn was inadmissible hearsay.

Haskins's recounting of what Detective Littlejohn said paraphrased an out-of-court statement placing Haskins at the crime scene. Haskins's statement, however, also was never offered for the truth of the matter asserted. After the call was played at trial, the prosecutor first elicited that it had been Detective Littlejohn who said Haskins had witnessed the murder. Haskins then explained that he told Detective Littlejohn he did not witness the murder. Rather than suggest an inference from Detective Littlejohn's out-of-court accusation, the prosecutor then asked Haskins directly, "Now, was that true, that you weren't out there?" Haskins replied that he was at the alley, but had left before Borum was shot. Haskins said that he

---

19. Miguel Crouch pled guilty to one count of possession of an unregistered firearm and received a sentence of probation; the government also agreed to dismiss a charge of unlawful possession of ammunition. In exchange, Miguel agreed to testify against appellant at trial.

20. Haskins mentioned Detective Littlejohn "talking about [what] somebody said that they seen me out there I was like, man, I wasn't there. I rolled out."

heard gunshots as he left the alley, and "[he] wasn't out there because [he] didn't want to be involved." This questioning clarified another part of the conversation in which appellant had shown his knowledge of the crime when he told Haskins that the .380 caliber handgun did not belong to Miguel Crouch, a supposition consistent with the theory that appellant, not Miguel, was the triggerman.[21] As with the other statements of which appellant complains, Detective Littlejohn's out-of-court statements were not introduced to show the truth of the matter asserted, but, in this case, to put the rest of the conversation in context. Thus, they were not hearsay. *Mercer,* 864 A.2d at 118.

 In arguing that the recordings were more prejudicial than probative, appellant asserts that the phone calls were innocent (*i.e.,* on their face, they were not incriminating), but that the government "misled" the jury by suggesting that appellant's statements in the calls could have been made only by someone guilty of the crime, rendering them highly prejudicial. This court "follow[s] the policy set forth in Federal Rule of Evidence 403 that evidence, although relevant and otherwise admissible, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *(William) Johnson v. United States,* 683 A.2d 1087, 1090 (D.C.1996) (en banc); *see id.* at 1100 (noting "the policy of admitting as much relevant evidence as it is reasonable and fair to include").

The probative value of the phone calls is not readily apparent from reading the transcripts of the calls. As the trial court observed, much of the content of the calls appeared to have been quite "cryptic." The government offered the jury plausible interpretations of the calls, however, i.e., that appellant was conscious of his own

guilt, or had prior knowledge of certain details of the crime. At trial defense counsel argued that the calls should not be interpreted as the government suggested. That the parties disagreed, however, does not mean that the phone calls were not probative or that they were unduly prejudicial. As the trial court observed at the hearing on appellant's motion *in limine,* "There's nothing misleading about this. It either means one thing or the other .... The government] think[s] the true meaning is what they say it is. And [defense counsel] think[s] it's arguable that the meaning is something different." The trial court did not abuse discretion in determining that the resolution of these ambiguities was best left for the jury.

### E. Identity of Confidential Informant

 Appellant's fingerprints were found on a plastic cup at the crime scene. However, because of a mistake in numbering items of evidence, it was erroneously communicated to Detective Littlejohn that appellant's fingerprints appeared on bullets inside the murder weapon. On cross-examination of Detective Littlejohn, defense counsel elicited the mistake about appellant's fingerprints, suggesting to the jury that this mistake was the reason why the investigators had focused on appellant as a suspect, to the exclusion of other suspects, because no other evidence linked appellant to the crime. On redirect, Detective Littlejohn testified that his unit had another lead: a confidential informant, within twenty-four hours of the murder, had reported that someone had hired appellant to kill Borum. The government argued to the jury that the tip gave detectives an additional reason to focus the investigation on appellant. That tip turned out to be unsubstantiated.

Prior to the second trial, defense counsel filed a motion *in limine* asking the

---

**21.** The call was played again during the prosecutor's closing argument.

court to permit the defense to introduce testimony about the mistake in identifying appellant's fingerprint on the bullets, but prohibit the government from introducing evidence of the confidential informant's tip. Counsel argued that his defense relied on two premises: (i) the dearth of evidence connecting him to the murder, and (ii) the lack of any motive. Defense counsel wanted to elicit the detective's mistake and to highlight the lack of evidence against appellant, without having the government respond with a highly prejudicial, unsubstantiated tip from a confidential informant that would, without an evidentiary foundation, lead the jury to think appellant had a motive for the murder.

In response, the government represented that it did not intend to introduce evidence about the informant unless defense counsel first questioned Detective Littlejohn about the erroneous fingerprint report. Defense counsel replied that the government should be compelled to disclose the identity of the confidential informant prior to the court's decision on the motion, citing to *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). *See id.* at 60–61, 77 S.Ct. 623 ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege [of the government to keep the informant's identity secret] must give way."); *see, e.g., Sturgess v. United States,* 633 A.2d 56, 60 (D.C.1993). Appellant argued that "before anything like [the testimony regarding the murder-for-hire] could be admitted, the defense would have a critical need about this so-called confidential informant ... in order to investigate whether the statement actually took place."

The court addressed the motion *in limine* at a hearing on March 30, 2009, just before the start of the second trial. At the hearing defense counsel clarified the reason the defense wanted to mention the fingertip evidence mix-up. Counsel explained that the defense would focus on Miguel Crouch's state of mind in accusing appellant, rather than on the investigation's focus on appellant. When he accused appellant of being involved in the crime, Miguel was facing weapons charges and was himself a suspect in the murder. Thus, according to defense counsel, Miguel had a motive to accuse someone else of the murder. The detective's mistaken belief that fingerprints tied appellant to the murder weapon led the detective to mention appellant's nickname ("Cruddy Buddy") to Miguel, who seized on it to divert attention from himself.

The judge commented on counsel's change in strategy, "I don't know that that's how you pitched it in the first trial, but you're not stuck with the first trial." The judge continued, "[I]t's not your theory this time around that the police focused on the wrong guy and rushed to judgment ... because of a mistake in the item numbering[.] [Y]ou wouldn't need to even introduce mistaken item numbering and confusion of the detective at all, his state of mind. What you would want to introduce only is ... [that] the detective goes to Miguel Crouch and says the following words, which had this impact on Miguel Crouch." The judge agreed with the government that under this new theory, defense counsel would not need to discuss the fingerprint mistake at all.

The judge told defense counsel that "if that's all you're offering," she would forbid the government from introducing any evidence about the confidential informant. However, if appellant later decided to cross-examine Detective Littlejohn about the fingerprint mistake, thereby "arguing [that there had been] a rush to judgment

at the exclusion of other potential suspects," then "that *could* well open the door to the additional evidence" including the confidential informant's tip. (Emphasis added.) The hearing concluded without appellant making any mention of his *Roviaro* request for the informant's identity. Subsequently, at trial, the defense never elicited any testimony regarding the fingerprints, and the government never elicited any testimony regarding the confidential informant. The trial judge, therefore, never ruled on defense counsel's request for the identity of the confidential informant.

Appellant revives his *Roviaro* argument on appeal, asserting that the trial court erred by denying counsel's request for the informant's identity. Contrary to his position at the hearing on the motion *in limine* before the second trial, appellant now argues that he needed to show that the fingerprint error caused the investigation to focus on him and the accusations from various biased witnesses. Had defense counsel attempted to bring this out at trial, he argues, the court would have allowed the government to introduce evidence about the confidential informant's tip and, to impeach the reliability of the informant's tip, appellant would have needed to know the informant's identity. Therefore, he argues, the trial court committed preju-

dicial error by failing to compel the government to disclose the informant's identity.

 Appellant has waived this argument. "We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal." *Brown v. United States*, 627 A.2d 499, 508 (D.C.1993); *accord, Brown v. United States*, 864 A.2d 996, 1002 (D.C. 2005). Although appellant requested the informant's identity in his reply memorandum to the government's response to his motion *in limine*, he did not press this request at the hearing on the motion, *see Thorne v. United States*, 582 A.2d 964, 965 (D.C.1990) ("A party who neglects to seek a ruling on his motion fails to preserve the issue for appeal."), and instead relied on a new theory to explain why Miguel Crouch identified him to the detective.[22] Appellant represented that he would not seek to introduce any evidence about the fingerprint error and, on this condition, the court agreed to exclude any evidence about the confidential informant's tip. This was a tactical choice on appellant's part that completely obviated any need for the informant's identity. On this record, appellant cannot now claim on appeal that *Roviaro* required the trial court to honor his request for the identity of the confidential informant.[23]

---

**22.** As explained by defense counsel at the hearing, appellant's strategy would be to focus on Miguel Crouch's state of mind and why he chose to accuse appellant (because the investigators suggested his name), and to leave aside Detective Littlejohn's state of mind and why he chose to focus on appellant (because of the evidence mix-up).

**23.** Appellant's change of tactic also serves to distinguish his case from *Roviaro*. In *Roviaro*, a confidential informant had perpetrated the charged crime with the defendant and was the only person with the defendant when certain elements of the crime were allegedly committed. *See Roviaro*, 77 S.Ct. at 629–30.

If called as a witness, the informant would have been the defendant's "one material witness." *Id.* at 629. Accordingly, the informant's testimony would have been crucial because it was "highly relevant," potentially "helpful to the defense," and was the defendant's only possible source of exculpatory testimony. *Id.* at 628–29. In this case, on the other hand, the court granted defense counsel's request to exclude any evidence regarding the informant's tip that appellant had been ordered to kill Borum, and the government never attempted to introduce any evidence of appellant's motive at trial. Accordingly, the identity of the informant would have been neither "helpful," nor even "rele-

For the foregoing reasons, appellant's convictions are hereby

*Affirmed.*

vant" to appellant's defense. *Roviaro,* 77 S.Ct. at 629